# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ANTHONY J. GENIER, SR.,

             Plaintiff,

     v.

SERGEANT VANARNUM and CAPTAIN
McKENNA,

             Defendants.

Civil Action No.
9:13-CV-1460 (GTS/DEP)

_____

APPEARANCES:                             OF COUNSEL:

FOR PLAINTIFF:

ANTHONY J. GENIER, SR., *Pro se*
14-A-0698
Downstate Correctional Facility
Box F
Fishkill, NY 12524

FOR DEFENDANTS:

FITZGERALD MORRIS BAKER        JOSHUA D. LINDY, ESQ.
FIRTH, P.C.
16 Pearl Street
P.O. Box 2017
Glens Falls, NY 12801

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Anthony Genier, Sr., a former inmate at the Washington County Correctional Facility ("WCCF"), has commenced this action against two corrections workers employed at the facility, pursuant to 42 U.S.C. § 1983, alleging that they deprived him of his civil rights. In his complaint, plaintiff alleges that his procedural due process rights were violated during the course of a disciplinary hearing, based upon the hearing officer's refusal to permit him to present witnesses and cross-examine the corrections officers upon whose statements a finding of guilt was based, in violation of his rights under the Fourteenth Amendment to the United States Constitution.

Currently pending before the court is a motion by the defendants for summary judgment dismissing plaintiff's complaint. In their motion, defendants argue that no reasonable factfinder could conclude, based upon the record now before the court, that plaintiff's procedural due process rights were violated, and that in any event they are entitled to qualified immunity. For the reasons set forth below, I recommend that defendants' motion be granted.

I.    BACKGROUND[1]

At the times relevant to his claims in this action, plaintiff was an inmate in the WCCF as a result of a conviction for driving while intoxicated, resulting in a sentence of ten months of incarceration.[2] Dkt. No. 33-5 at 11-17. On July 2, 2013, an incident occurred in the WCCF cell block area where plaintiff was housed, involving the plaintiff and other inmates throwing items, including playing cards.[3] *Id.* at 38-41. As a result of the commotion, the plaintiff and two other inmates were told to pack their belongings, and that they were being transferred to another cell block. *Id.* During the course of the transfer, a confrontation occurred between the plaintiff and several corrections officers. *Id.*; *see also* Dkt. No.

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]    The record is equivocal as to whether the conviction giving rise to the ten month sentence was for misdemeanor driving while intoxicated, in violation of N.Y. Vehicle and Traffic Law § 1192(2) and/or (3), or instead driving while ability impaired as prohibited by N.Y. Vehicle and Traffic Law § 1192(1). *See, e.g.* Dkt. No. 33-5 at 12 ("the charges I went to jail for was [sic] a DWI, . . ."); Dkt. No. 33-5 at 13 (". . . I ended up pleading out to a misdemeanor DWI."); Dkt. No. 33-5 at 16-17 ("Q. DWAI? A. Yeah, there you go. Q. The misdemeanor level? A. yes."). *Id.* Though not relevant to plaintiff's claims in this action, it is likely that the conviction was for driving while intoxicated because the term of imprisonment that can be imposed for driving while ability impaired is limited to fifteen days, and a sentence to a period of incarceration of ten months is more consistent with a penalty for misdemeanor driving while intoxicated. *See* N.Y. Vehicle & Traffic Law §1193(1).

[3]    At the time of the occurrence, plaintiff was on "lock-in" status as a result of a February 19, 2013 incident in which he assaulted another inmate by pouring hot water on him. Dkt. No. 33-5 at 28-29, 46-47.

33-8 at 2-3.

At this point the parties' versions of the relevant events diverge. According to the plaintiff, he was pushed and assaulted by corrections officers, to a point where he lost consciousness. Dkt. No. 33-5 at 38-41. In contrast, the corrections officers involved allege that plaintiff was ordered to hasten his pace to keep up with the other two inmates walking ahead of him, and that when Corrections Officer David Jamieson placed his hand on plaintiff's back, plaintiff resisted and pushed back in an aggressive manner, leading to a "code red" call for assistance and efforts on the part of several corrections officers to subdue the plaintiff and place him in restraints. *See* Dkt. Nos. 33-8, 33-9, 33-10 and 33-11.

As a result of the incident, plaintiff was transferred into the facility's special housing unit ("SHU"), and a misbehavior report was issued by Corrections Officer Jamison accusing plaintiff of violating four WCCF rules, including injuring officers while resisting, disturbing the orderly running of the facility, failure to follow orders of staff, and engaging in violent conduct.[4] Dkt. No. 33-8 at 3; *see* Dkt. No. 33-7 at 34. Corrections

---

[4]     Under the Inmate Discipline Policy and Procedure in place at the WCCF, disciplinary matters are broken down into three classes, including (1) Class A, representing the most serious, (2) Class B, an intermediate designation, and (3) Class C, representing "infractions of rules that do not threaten the security of the Facility or a unit. . .". Dkt. No. 33-7 at 10. Neither the misbehavior report issued to the plaintiff nor the hearing officer's determination reveals the level of severity of the offense under this regime. The misbehavior report issued to the plaintiff specifies disciplinary violations

Sergeant Terry VanArnum, a defendant in this action, was assigned to conduct a disciplinary hearing to address the charges set forth in that misbehavior report. *See generally* Dkt. No. 33-7. Defendant VanArnum provided the plaintiff with a "24 Hour Hearing Board Notice" on July 11, 2013, advising that a hearing would be conducted in connection with the matter on July 15, 2013. *Id.* at 6, ¶¶ 14-16; *see* Dkt. No. 33-7 at 40. Plaintiff signed and acknowledged receipt of that notice. *Id.*

Defendant VanArnum convened the disciplinary hearing on July 15, 2013, as scheduled. Dkt. No. 33-7 at 7, ¶ 18. At the outset of the hearing, plaintiff was asked whether he understood the charges, and stated that he did. *Id.*, ¶ 19. When asked by the hearing officer to respond to the charges, plaintiff pleaded not guilty to all counts. *Id.*; *see also* Dkt. No. 33-5 at 58-60. The parties' versions concerning the remainder of the hearing are conflicting.

According to defendant VanArnum, "during the hearing, Mr. Genier failed to call witnesses or request any statements regarding the charges brought against him." Dkt. No. 33-7 at 7. Plaintiff, in stark contrast, states

---

numbered 2.10, 6.13, 11.12, and 6.11. *See* Dkt. No. 33-7 at 34. Unfortunately, none of those numbers appears on the portion of the disciplinary policy that assigns the violations listed to an appropriate class. *Id.* at 19. However, it would appear that the charges most closely align with Class B violations, which are defined as "[b]ehavior that violates a Facility rule, regulation, or a behavior expectation that does not present an immediate serious threat to the safety and security of the CF facility, but is disruptive to the unit or area in which it occurs."

that his request to call witnesses at the hearing was denied, and further that he was not permitted to view surveillance video footage of the incident. Dkt. No. 9 at 4-5; Dkt. No. 33-5 at 57-66.

At the conclusion of the hearing, which consisted principally of the hearing officer's review of supporting depositions from Corrections Officers Phillip White, Brian Tripp, Kyle Sweet, and Jacob Freeburne, and Corrections Sergeant David Jamison, defendant VanArnum found plaintiff guilty on all four counts, and imposed sentences, cumulatively, totaling two-hundred sixty days of keeplock confinement, with a corresponding loss of various prison privileges. Dkt. No. 33-7 at 7-8, 47.

Hearing Officer VanArnum's determination was upheld on appeal to Captain Eugene McKenna, the jail administrator for the WCCF and the other defendant in this action. Dkt. No. 33-6 at 2, 7-9; Dkt. No. 33-7 at 8, 47. When considering plaintiff's appeal, defendant McKenna reviewed the responding officers' statements, the felony criminal complaint charging the plaintiff in connection with the incident, and plaintiff's disciplinary record.[5] Dkt. No. 33-6, at 7-8. In addition, defendant McKenna visited the scene of the incident, and spoke with defendant VanArnum. *Id.* at 8. Defendant

---

[5]     A felony criminal complaint was lodged against the plaintiff as a result of the incident, charging him with assault in the second degree. Dkt. No. 33-6 at 8; Dkt. No. 33-7 at 6; *see* Dkt. No. 37-6 at 36. As a result of that felony complaint, plaintiff entered a plea of guilty in January 2014 to attempted assault in the second degree, and was sentenced to a period of incarceration of between one and three years based upon his plea. Dkt. No. 33-5 at 71-75.

McKenna also determined that the inmate worker claimed by plaintiff to have witnessed the incident from the facility laundry room could have not observed the altercation, which occurred in front of the medical room some thirty feet away from the laundry room and down a hallway from the medical room. *Id.* at 9.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on November 25, 2013, and later filed an amended complaint, the currently operative pleading, on June 26, 2014. Dkt. Nos. 1, 9. Plaintiff's amended complaint names Sergeant VanArnum, the hearing officer, and Captain McKenna, who affirmed the hearing determination on appeal, as defendants, and asserts against them a single claim for the deprivation of procedural due process. Dkt. No. 9. Plaintiff requests an award of damages in the amount of $40 million.[6] *Id.* Issue was subsequently joined by defendants' filing of an answer on September 16, 2014, in which they have generally denied plaintiff's allegations and asserted various affirmative defenses. Dkt. No. 15.

On September 30, 2015, following the close of discovery,

---

[6]    Plaintiff also requests that the misbehavior report issued against him be removed from his prison records. Dkt. No. 9 at 7. At least one court has concluded that such relief is available only via a habeas corpus petition, and cannot properly be issued in a section 1983 action. *See Burnell v. Coughlin, et al.*, 975 F.Supp. 473, 479 n.3 (W.D.N.Y. 1997) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973)). In any event, plaintiff pled guilty in a criminal proceeding to the same charges that were contained in the misbehavior report. As a result, he is estopped from litigating the merits of the misbehavior report and seeking its expungement.

defendants moved for the entry of summary judgment. Dkt. No. 33.
Despite receiving notice of that motion and the requirement that any
response to the motion be filed by October 20, 2015, plaintiff has failed to
oppose defendants' motion, which is now ripe for determination, and has
been referred to me for the issuance of a report and recommendation,
pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York
Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal
Rules of Civil Procedure. Under that provision, the entry of summary
judgment is warranted "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S.
317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247
(1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391
F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this
inquiry if it "might affect the outcome of the suit under the governing law."
*Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549,
553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence
is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

When a non-moving party fails to respond to a motion for summary judgment, the movants' burden on their motion "is lightened such that, in

order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Henry v. Dinelle, et al.*, 10-CV-0456, 2011 WL 5975027, *10 (N.D.N.Y. Nov. 29, 2011) (quoting *Xu-Shen Zhou v. S.U.N.Y. Inst. of Tech.*, 08-CV-0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sep. 14, 2011), *vacated in part on other grounds by* 499 F. App'x 105 (2d Cir. Oct. 10, 2012)).

B.    Analysis of Plaintiff's Procedural Due Process Claim

In his complaint, as amended, plaintiff asserts a single cause of action, claiming that the defendants violated his rights under the Fourteenth Amendment. More specifically, plaintiff claims that defendant VanArnum violated his rights by finding him guilty of disciplinary infractions and sentencing him to a period of two hundred sixty days of SHU confinement, without affording him procedural due process, and that defendant McKenna violated his rights by upholding that determination on appeal. In support of that claim, plaintiff contends that defendant VanArnum rejected his request to call witnesses in his defense, and to cross-examine the complaining corrections officers, and refused to permit him to review and offer into evidence surveillance video recordings of the relevant events. *See generally*, Dkt. No. 9.

To establish a procedural due process claim under section 1983, the plaintiff must show that he (1) possessed an actual liberty interest, and (2)

was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). Defendants maintain that plaintiff cannot make either of these required showings.

As it relates to the first required showing, in *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a constitutionally significant liberty interest deprivation in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state, or in this case Washington County, has created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. It appears from the record now before the court that, by its regulatory scheme, Washington County has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor, and the defendants do not appear to argue otherwise. *Cf.*, *LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-

0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.).[7]

Accordingly, in evaluating the defendants' motion, I must determine whether there exists evidence in the record showing that the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law.[8] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)).

Restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (citing *Colon v. Howard*, 215 F.3d 227 (2d Cir. 2000)). Accordingly, when the length of restrictive

---

[7]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[8]   In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.'" *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir.1999)). On the other hand, the Second Circuit has suggested that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

The Second Circuit has explained that where the plaintiff was confined for an intermediate duration of between 101 and 305 days, the court must develop "a detailed record of the conditions of the confinement relative to ordinary prison conditions . . . and make a fact-intensive inquiry, . . . examining the actual circumstances of SHU confinement in the case before it without relying on its familiarity with SHU conditions in previous cases." *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir.2004) (internal

quotation marks and citations omitted). "Disputes about conditions may
not be resolved on summary judgment, . . . but where the conditions are
undisputed, the *Sandin* issue should be resolved by the court as a matter
of law." *Id.*

Plaintiff's amended complaint does not elaborate on the conditions of
his SHU confinement during the period in question, and his failure to
oppose defendants' motion leaves uncontested their claims concerning the
conditions that he faced while serving his disciplinary sentence.[9]
According to the defendants' submissions, SHU cells at the WCCF are
configured in one linear row, each measuring seven feet by sixteen feet in
dimension. Dkt. No. 33-6 at 5. Attached to the outside of each cell is a
cage of seven feet by eight feet in dimension, for use for recreational
purposes. *Id.* Inmates relegated to SHU confinement are permitted to have
their property, after it is searched; are offered one hour of recreation and a
shower daily; are served the same meals, in their cells, as those served to
the general population in the facility messhall; are provided with visitation

---

[9] The record is nebulous as to how much of the penalty imposed was actually
served. Plaintiff's deposition transcript suggests that his criminal sentence ran for ten
months beginning February 8, 2013, and that he was transferred out of the WCCF on
February 20, 2014. *See* Dkt. No. 33-5 at 17, 71. It appears that plaintiff was confined in
SHU from July 2, 2013 – the date of the incident that gave rise to his SHU confinement
– until the date of his transfer. Dkt. No. 33-7 at 45; Dkt. No. 33-5 at 49, 58, 75-76.
Plaintiff testified that his confinement in SHU ended with his transfer. Dkt. No. 33-5 at
70-71. It therefore appears that he was required to serve only 234 days of the full 260
day sentence.

privileges; and have the same access to healthcare and mental health services afforded to all other inmates in general population. *Id.* at 6.

Because plaintiff has failed to oppose the defendants' motion, the foregoing represent the only facts in the record relative to plaintiff's SHU confinement.[10] Accordingly, there exists no genuine dispute regarding the conditions of plaintiff's confinement requiring determination by a jury, and the court is thus positioned to decide the *Sandin* issue as a matter of law.

The record includes no evidence suggesting that the plaintiff's SHU confinement imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life. Under such circumstances, to deny the defendants' motion would be tantamount to a conclusion that SHU confinement of 234 days imposes a *per se* atypical and significant hardship on an inmate such that a liberty interest automatically attaches to such a term of SHU confinement. Such a conclusion would run afoul of Second Circuit precedent expressly requiring an analysis of confinement conditions in a case where the plaintiff has been confined for an intermediate duration of between 101 and 305 days, effectively narrowing the 305-day window to 233 days. Several other courts, when similarly faced with the absence of any record evidence showing an atypical and

---

[10]     Plaintiff did not address the conditions of his confinement in his amended complaint or during his deposition.

significant hardship resulting from SHU confinement of between 101 and 305 days, have declined to find the existence of a liberty interest. *See, e.g., Henry*, 2011 WL 5975027, at *10 (dismissing due process claim where the plaintiff "failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this 150-day period were more severe than normal SHU conditions"); *Dawkins v. Gonyea et al.*, 646 F.Supp.2d 594, 606-607 (S.D.N.Y. 2009) ("Because Dawkins failed to make any allegations detailing the conditions of his confinement in SHU, and because the [280-day] duration of his confinement was shorter than confinements that courts in this Circuit have deemed sufficient to impose per se atypical or significant hardship, the Court finds that Dawkins has not pled a cognizable liberty interest. "); *Black v. Selsky, et al.*, 15 F.Supp.2d 311, 314-316 (W.D.N.Y. 1998) (concluding that plaintiff's "confinement in SHU for 180 days does not present the type of atypical and significant deprivation in which a state may conceivably create a liberty interest" where there was no accompanying record evidence showing restrictions "greater than the restrictions imposed on the inmate in *Sandin*"); *Spence v. Senkowski*, 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days spent by the plaintiff in SHU, where he was subjected to numerous conditions of confinement that were more

restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord*, *Husbands v. McClellan*, 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (finding no liberty interest deprivation where the plaintiff served 180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky*, 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (same, in a case involving 192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin*, 949 F. Supp. 112, 116-17 (N.D.N.Y.1996) (same, in a case involving 180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin*, 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *Carter v. Carriero*, 905 F.Supp. 99, 103-104 (W.D.N.Y. 1995) (270 days of SHU confinement did not impose a *per se* "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" such that the failure to allow plaintiff to call a witness at a disciplinary hearing giving rise to his confinement did not trigger a liberty interest).

For these reasons, I find that the defendants have satisfied their burden of showing facial merit to their request that plaintiff's due process claim be dismissed for failure to establish the deprivation of a cognizable liberty interest. Accordingly, I recommend the dismissal of plaintiff's due process claim on that basis, and find it unnecessary to address either the second prong of the due process test or defendants' qualified immunity argument.[11] In declining to address the second prong of the due process test, I note in passing that I believe there exists a genuine material issue of fact that would preclude the entry of summary judgment in defendants' favor on this prong.[12]

---

[11] With respect to the second prong of the due process test, the procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest were discussed by the Supreme Court in seminal its decision in *Wolff v. McDonnell*, 418 U.S. 539 (1974). In *Wolff*, the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487-88.

[12] In their motion, defendants contend that plaintiff was provided with all of the procedural due process guaranteed under the Fourteenth Amendment. In support of that position they assert, including in their statement of undisputed material facts propounded pursuant to Local Rule 7.1(a)(3) of the Northern District of New York, that the plaintiff failed to call witnesses or request any statements regarding the charges brought against him during the hearing before defendant VanArnum. *See* Dkt. No. 33-12 at 7. Plaintiff, however, has squarely controverted this statement, both in his amended complaint, which is submitted under penalty of perjury, and in his deposition

IV.  SUMMARY AND RECOMMENDATION

Plaintiff claims that he was deprived of an actual liberty interest without procedural due process in violation of the Fourteenth Amendment. Because I conclude, based upon the record now before the court, that there exists no evidence in the record showing that plaintiff's confinement in the WCCF SHU represented a significant and a typical departure from the ordinary incidents of prison life, and that, accordingly, he was not deprived of a liberty interest sufficient to trigger the procedural safeguards guaranteed under the Fourteenth Amendment, I find that the entry of summary judgment dismissing plaintiff's complaint is warranted. Accordingly, it is hereby respectfully

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 33), be GRANTED, and that plaintiff's complaint be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

testimony, which is also sworn. Dkt. No. 9 at 4; Dkt. No. 33-5 at 65-69.

report and recommendation upon the parties in accordance with this

court's local rules.

Dated:    June 20, 2016
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jonathan HENRY, Plaintiff,
v.
James F. DINELLE, Corrections Officer; Russell E.
Duckett, Corrections Officer; Alfred J. Deluca,
Corrections Officer; Donald L. Broekema, Sergeant;
and Jean Norton, Nurse, Defendants.
No. 9:10–CV–0456 (GTS/DEP).

Nov. 29, 2011.
Sivin & Miller, LLP, Edward Sivin, Esq., of Counsel,
New York, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Timothy P. Mulvey, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### *MEMORANDUM–DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this prisoner civil
rights action filed by Jonathan Henry ("Plaintiff") against
the five above-captioned employees of the New York
State Department of Corrections and Community
Supervision ("Defendants"), is Defendants' motion for
partial summary judgment. (Dkt. No. 24.) For the reasons
set forth below, Defendants' motion is granted in part and
denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint
alleges that, between approximately January 29, 2009, and
January 31, 2009, at Ulster Correctional Facility in
Napanoch, New York, Defendants violated Plaintiff's
following rights in the following manner: (1) Defendants

Nurse Jean Norton, Corrections Officer James F. Dinelle,
Corrections Officer Russell E. Duckett and Corrections
Officer Alfred J. DeLuca violated Plaintiff's rights under
the First Amendment by filing retaliatory false
misbehavior reports against him, and subsequently
providing false testimony against him at administrative
disciplinary hearings, which resulted in his spending time
in the Special Housing Unit ("SHU"); (2) Defendant
Dinelle violated Plaintiff's rights under the Eighth
Amendment by assaulting him on two occasions, and
Defendants DeLuca and Duckett violated Plaintiff's rights
under the Eighth Amendment by assaulting him once; (3)
Defendant Sergeant Donald L. Broekema violated
Plaintiff's rights under the Eighth Amendment by failing to
intervene to prevent one of these assaults from occurring;
(4) Defendant Norton violated Plaintiff's rights under the
Eighth Amendment by harassing him almost immediately
before he was subjected to the above-described assaults;
and (5) Defendants Norton, Dinelle, Duckett and DeLuca
violated Plaintiff's rights under the Fourteenth Amendment
by performing the aforementioned acts, which constituted
atypical and significant hardships in relation to the
ordinary incidents of prison life. (*See generally* Dkt. No.
1 [Plf.'s Compl.].) Familiarity with the factual allegations
supporting these claims in Plaintiff's Complaint is assumed
in this Decision and Order, which is intended primarily for
review by the parties. (*Id.*)

### B. Undisputed Material Facts

At all times relevant to Plaintiff's Complaint, Plaintiff
was an inmate and Defendants were employees of the New
York State Department of Corrections and Community
Supervision at Ulster Correctional Facility. On January 30,
2009, Defendant Dinelle took Plaintiff to the medical
ward, because Plaintiff was experiencing a foul odor and
oozing from a wound on his leg. After Defendant Norton
treated Plaintiff, she filed an inmate misbehavior report
against Plaintiff based on (1) Plaintiff's harassing behavior
toward Defendant Norton and Defendant Dinelle, and (2)
Plaintiff's disobedience of a direct order to be quiet. The
misbehavior report was signed by Defendant Dinelle as an
employee witness.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

At his deposition, Plaintiff testified, while leaving the infirmary, he was punched and kicked by Defendant Dinelle and two unknown prison officials. Plaintiff was then taken to the SHU, where he waited with Defendants Dinelle and Duckett, and up to three more individuals, for a sergeant to arrive. When Defendant Broekema (a sergeant) arrived at the SHU, Plaintiff was taken to a frisk room, where a frisk was conducted. During the frisk, Defendants Dinelle, Duckett and (Plaintiff suspected) DeLuca used force to bring Plaintiff to the ground. Plaintiff testified that, during the use of force, he was simultaneously punched in the nose by two officers while their supervisor watched.

**\*2** After the use of force, Plaintiff stated to Defendants Dinelle, Broekema and Duckette, "I will be contacting my attorney," or "I will be calling a lawyer." [FN1] Plaintiff never used the term "grievance" when addressing Defendants Dinelle, Broekema and Duckette (or Defendant Norton).[FN2] Subsequently, Defendant Duckett filed an inmate misbehavior report against Plaintiff based on his disobedience of frisk procedures and a direct order. Defendant DeLuca signed this report as a witness to the events.

> FN1. (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 100, 102–03 [attaching pages 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo .].)

> FN2. (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 59–60, 100, 102–03 [attaching pages 175, 176, 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo.].)

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties. (*Id.*)

## C. Defendants' Motion

Generally, in support of their motion for partial summary judgment, Defendants argue as follows: (1) Plaintiff's claim that Defendants issued false misbehavior reports should be dismissed because Plaintiff has no constitutional right to be free of false misbehavior reports; (2) Plaintiff's First Amendment retaliation claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (a) engaged in protected activity, or (b) suffered adverse action as a result of engaging in protected activity; (3) Plaintiff's Fourteenth Amendment substantive due process claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants deprived Plaintiff of his liberty rights; (4) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she (a) used force against Plaintiff, or (b) was in a position to prevent the use of force from occurring, yet failed to do so; (5) Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"; (6) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Broekema had a realistic opportunity to intervene to prevent or stop the assault, yet failed to do so; and (7) Defendants are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].).[FN3]

> FN3. In their motion, Defendants do not challenge the evidentiary sufficiency of Plaintiff's Eighth Amendment excessive-force claim against Defendants Dinelle or Duckett. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].)

In Plaintiff's response to Defendants' motion for partial summary judgment, he argues as follows: (1) his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

retaliation claims should not be dismissed because there are triable issues of fact as to whether Defendants retaliated against him for stating that he would be contacting an attorney; (2) his failure-to-intervene claim against Defendant Broekema should not be dismissed because there are triable issues of fact as to whether Defendant Broekema failed to prevent excessive force from being used against him; (3) his excessive-force claim against Defendant DeLuca should not be dismissed because there are triable issues of fact as to whether Defendant DeLuca used excessive force against him; and (4) Defendants are not protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].) [FN4]

> FN4. Plaintiff does not oppose Defendants' arguments that (1) Plaintiff's excessive-force claim against Defendant Norton should be dismissed, and (2) Plaintiff's substantive due process claim should be dismissed. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].)

**\*3** In their reply, Defendants essentially reiterate their previously advanced arguments. (*See generally* Dkt. No. 29, Attach. 1 [Defs .' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at *2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

### 1. First Amendment Retaliation Claim

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of his First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

> *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that (1) the speech or conduct at issue was "protected", (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

***4** In determining whether an inmate has established a prima facie case of a causal connection between his protected activity and a prison official's adverse action, a number of factors may be considered, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002). Even where the inmate has established such a prima facie case, the prison official may be entitled to judgment as a matter of law on the inmate's retaliation claim where the prison official has satisfied his burden of establishing that the adverse action would have been taken on proper grounds alone. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Jordan v. Garvin,* 01–CV–4393, 2004 WL 302361, at *6 (S.D.N.Y. Feb.17, 2004).

**2. Eighth Amendment Claims of Excessive–Force and Failure–to–Intervene**

To establish a claim of excessive-force under the Eighth Amendment, a plaintiff must satisfy two components: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). In consideration of the subjective element, a plaintiff must allege facts which, if true, would establish that the defendant's actions were wanton " 'in light of the particular circumstances surrounding the challenged conduct.' " *Id.* (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 [2d Cir.1999] ). The objective component asks whether the punishment was sufficiently harmful to establish a violation "in light of 'contemporary standards of decency.' " *Wright,* 554 F.3d at 268 (quoting *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Generally, officers have a duty to intervene and prevent such cruel and unusual punishment from occurring or continuing. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). "It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora,* 08–CV–0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb.24, 2010) (Peebles, M.J.). A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation. *Id.* at *8. To establish a claim of failure-to-intervene, the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). Generally, officers cannot be held liable for failure to intervene in incidents that happen in a "matter of seconds." *Parker v. Fogg,* 85–CV–177, 1994 WL 49696 at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.).

**3. Fourteenth Amendment Substantive Due Process Claims**

***5** The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrence v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

Order (N.D.N.Y. filed Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

"An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes 'an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Whitaker v. Super,* 08–CV–0449, 2009 WL 5033939, at *5 (N.D.N.Y. Dec. 14, 2009) (Kahn, J. adopting Report–Recommendation by Lowe, M.J.) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 [1995] ). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). When evaluating whether an inmate's confinement in SHU violates his substantive due process rights, the issue, then, is whether his keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 64.

"In the Second Circuit, determining whether a disciplinary confinement constituted an 'atypical and significant hardship' requires examining 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement.' " *Whitaker,* 2009 WL 5033939, at *5 (quoting *Palmer,* 364 F.3d at 64). "Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an 'atypical and significant hardship' only if 'the conditions were more severe than the normal SHU conditions.' " *Id.* (quoting *Palmer,* 364 F.3d at 65).[FN5]

FN5. Generally, " '[n]ormal' SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Whitaker,* 2009 WL 5033939, at *5 n. 27 (citing *Ortiz v. McBride,* 380 F.3d 649, 655 [2d Cir.2004] ).

### 4. Qualified Immunity Defenses

**\*6** The qualified immunity defense is available to only those government officials performing discretionary functions, as opposed to ministerial functions. *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 [1992].[FN6] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007).[FN7] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).[FN8] As the Supreme Court has explained,

> FN6. *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

> FN7. *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' "); *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> FN8. *See also Malsh v. Corr. Oficer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

*Malley,* 475 U.S. at 341.[FN9]

> FN9. *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks omitted].

## III. ANALYSIS

### A. Plaintiff's Retaliation Claim Under the First Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (1) engaged in protected activity, or (2) suffered adverse action as a result of engaging in protected activity. More specifically, Defendants argue that the claim should be dismissed because (1) the statement of an inmate's intent to contact an attorney is not protected conduct, (2) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Norton knew of Plaintiff's intention to contact an attorney, and (3) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants' actions were retaliatory. (Dkt. No. 24, Attach.10.) [FN10]

> FN10. Defendants also argue that Plaintiff's First Amendment claim should be dismissed to the extent that it is based solely on the fact that misbehavior reports against him were *false* (as opposed to being false *and retaliatory* ). The Court agrees that Plaintiff has no general constitutional right to be free from false misbehavior reports. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). As a result, to the extent that the Plaintiff's Complaint may be construed as asserting a claim based solely on the issuance of false behavior reports, that claim is dismissed.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

**\*7** After carefully considering the admissible record evidence adduced in this case, and carefully reviewing the relevant case law, the Court has trouble finding that an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be "contacting [his] attorney," or "calling a lawyer" at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment—especially where, as here, the inmate did not reference the prison grievance process in his statement.

Representation by a lawyer is certainly not necessary to file an inmate grievance in the New York State Department of Corrections and Community Supervision, nor does such representation necessarily result in the filing of a grievance. Rather, such representation is most typically associated with the filing of a civil rights action in federal court (as is clear from the motions for appointment of counsel typically filed in federal court actions). As a result, the statement in question does not reasonably imply that Plaintiff would be filing a grievance as much as it implies that he was going to consult an attorney as to whether or not to file a civil rights action in federal court.

Here, such a statement is problematic. This is because, generally, the filing of the prisoner civil rights action in federal court in New York State must be preceded by the prisoner's exhaustion of his available administrative remedies (or his acquisition of a valid excuse for failing to exhaust those remedies). Any filing without such prior exhaustion (or acquisition of a valid excuse), under the circumstances, would be so wholly without merit as to be frivolous. Of course, filing a court action that is frivolous is not constitutionally protected activity.[FN11]

FN11. *See Wade–Bey v. Fluery,* 07–CV–117, 2008 WL 2714450 at *6 (W.D.Mich. July 8, 2010) ("Although it is well established that prisoners have a constitutional right of access to the courts ..., the filing of a frivolous lawsuit would not be protected activity.") [citation omitted].

Moreover, to the extent that Plaintiff's statement could be construed as reasonably implying that he was going to consult an attorney as to whether or not to file a grievance, the Court has trouble finding that such a vague statement is constitutionally protected.[FN12] As one district court has stated, "[h]oping to engage in constitutionally protected activity is not itself constitutionally protected activity."[FN13] The Court notes that a contrary rule would enable a prisoner who has committed conduct giving rise to a misbehavior report to create a genuine issue of material fact (and thus reach a jury) on a retaliation claim (alleging adverse action based on the issuance of that misbehavior report) simply by uttering the words, "I'm calling a lawyer," after he commits the conduct in question but before the misbehavior report is issued.

FN12. The Court notes that numerous cases exist for the point of law that even *expressly threatening* to file a *grievance* does not constitutes protected activity. *See, e.g., Bridges v. Gilbert,* 557 F.3d 541, 554–55 (7th Cir.2009) ("[I]t seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance.") [emphasis in original]; *Brown v. Darnold,* 09–CV–0240, 2011 WL 4336724, at *4 (S.D.Ill. Sept.14, 2011) ("Plaintiff cannot establish that his threat to file a grievance against Defendant Darnold is a constitutionally protected activity."); *Koster v. Jelinek,* 10–CV–3003, 2011 WL 3349831, at *3, n. 2 (C.D.Ill. Aug.3, 2011) ("The plaintiff does not seem to be asserting that he had a First Amendment right to threaten the facilitators with lawsuits and grievances, nor does the Court believe that he has such a right."); *Ingram v. SCI Camp Hill,* 08–CV–0023, 2010 WL 4973302, at *15 (M.D.Pa. Dec.1, 2010) ("Stating an intention to file a grievance is not a constitutionally protected activity."), *aff'd,* No. 11–1025, 2011 WL 4907821 (3d Cir. Oct.17, 2011); *Lamon v. Junious,* 09–CV–0484, 2009 WL 3248173, at *3 (E.D.Cal. Oct.8, 2009) ("A mere threat to file suit does not rise to the level of a protected activity...."); *Miller v. Blanchard,* 04–CV–0235, 2004 WL 1354368, at *6 (W.D.Wis. June 14, 2004) ("Plaintiff alleges that

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

defendants retaliated against him after he threatened to file a lawsuit against them. Inmates do not have a First Amendment right to make threats.").

FN13. *McKinnie v. Heisz,* 09–CV–0188, 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.").

In any event, even assuming, for the sake of argument, that Plaintiff's statement was constitutionally protected, the Court finds, based on the current record, that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his statement to Defendants Dinelle, Duckett, and Broekema that he would be contacting an attorney was a substantial or motivating factor for the issuance of the misbehavior report by Defendant Norton (which was signed by Defendant Dinelle as a witness), and the misbehavior report by Defendant Duckett (which was signed by Defendant DeLuca as a witness). The Court makes this finding for two alternate reasons.

*8 First, with regard to the misbehavior report issued by Defendant Norton, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she was aware Plaintiff would be contacting an attorney. In addition, with regard to the report made by Defendant Duckett (which was signed by Defendant DeLuca as a witness), although there is record evidence that Defendant Duckett had knowledge of Plaintiff's statement that he would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett had reason to believe, at the time the misbehavior report was issued, Plaintiff would actually follow through with his one-time oral statement, made on the heals of a heated incident.

Second, even assuming that Defendant Duckett or Defendant Norton had reason to believe Plaintiff would contact an attorney, Plaintiff has failed to adduce

admissible record evidence from which a rational factfinder could conclude that Defendant Duckett or Defendant Norton would not have issued the misbehavior report anyway, based on Plaintiff's actions. Indeed, at Plaintiff's disciplinary hearings, evidence was adduced that he in fact committed most of the misconduct alleged in the misbehavior reports, which resulted in the hearing officer finding multiple violations and sentencing Plaintiff to SHU. FN14 Furthermore, those convictions were never subsequently reversed on administrative appeal. FN15 As a result, no admissible record evidence exists from which a rational factfinder could conclude that Plaintiff has established the third element of a retaliation claim—the existence of a causal connection between the protected speech and the adverse action.

FN14. *See Hynes v. Squillance,* 143 F.3d 653, 657 (2d Cir.1998) (holding that defendants met their burden of showing that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct"); *Jermosen v. Coughlin,* 86–CV–0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (concluding, as a matter of law, that defendants showed by a preponderance of the evidence that they would have issued a misbehavior report against plaintiff even in the absence of his complaints against correctional department personnel, because they established that the misbehavior report resulted in a disciplinary conviction, "demonstrat[ing] that plaintiff in fact committed the prohibited conduct charged in the misbehavior report.").

FN15. For these reasons, the Court finds to be inapposite the case that Plaintiff cites for the proposition that the Court must accept as true his sworn denial that he committed any of the violations alleged in the misbehavior reports issued against him. *See Samuels v. Mockry,* 142 F.3d 134, 135–36 (2d Cir.1998) (addressing a situation in which a prisoner was placed in a prison's "Limited Privileges Program," upon a finding rendered by the prison's Program Committee, that he had refused to accept a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

mandatory work assignment, *"without a hearing or a misbehavior report"* ) [emphasis added]. The Court would add only that, even if it were to accept Plaintiff's sworn denial as true, the Court would still find that he has failed to establish that Defendants Duckett and Norton would not have issued the misbehavior reports against him anyway, based on their subjective belief that he was acting in a disturbing, interfering, harassing and disobedient manner at the time in question (as evident from, *inter alia,* their misbehavior reports, the disciplinary hearing testimony of three of the Defendants, and admissions made by Plaintiff during his deposition regarding the "confusion" and "misunderstanding" that occurred during his examination by Defendant Norton, his persistent assertions about his prescribed frequency of visits, and his unsolicited comments about his proper course of treatment).

For each of these alternative reasons, Plaintiff's retaliation claim under the First Amendment is dismissed.

**B. Plaintiff's Claims Under the Eighth Amendment**

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Norton used any force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so, (2) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Broekema had a reasonable opportunity to intervene and prevent the alleged assault by Defendants Dinelle, DeLuca and Duckett, yet failed to do so, and (3) Plaintiff's identification of Defendant DeLuca is "very tentative."

As an initial matter, because Plaintiff did not oppose Defendants' argument that his excessive-force claim against Defendant Norton should be dismissed, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou v.*

*S.U.N.Y. Inst. of Tech.,* 08–CV–0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sept.14, 2011)* (Suddaby, J.). After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, the Court can find no record evidence to support the claim that Defendant Norton used force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so. As a result, Plaintiff's Eighth Amendment claim against Defendant Norton is dismissed.

**\*9** Turning to Plaintiff's failure-to-intervene claim against Defendant Broekema, it is undisputed that it was Defendants Duckett, Dinelle, and DeLuca who used force against Plaintiff. Plaintiff testified that, while Defendant Broekema was in the room at the time, Defendant Broekema was standing behind Defendant Dinelle on his "immediate right." In addition, Plaintiff testified that Defendant Duckett's threat of physical force against Plaintiff was conditioned on Plaintiff's continued failure to comply with (what Plaintiff perceived to be) conflicting instructions by Defendants Duckett and Dinelle during the frisk. (Dkt. No. 24, Attach. 4, at 97–99.) Furthermore, Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by Defendant Duckett) that either Defendant Duckett or Defendant Dinelle punched him *one time* with a "closed fist" in the side of his nose, causing him to immediately fall to the ground. (*Id.* at 98–99.) Finally, Plaintiff testified that the kicks that he suffered soon after falling to the ground were limited in nature, having occurred only "a couple of times," and indeed having only *possibly* occurred. (*Id.* at 99.)

While the Court in no way condones the conduct alleged in this action, the Court is simply unable to find, based on the current record, that Plaintiff has adduced sufficient admissible record evidence to reach a jury on his Eighth Amendment claim against Defendant Broekema. Rather, based on the evidence presented, a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in Defendant Broekema's position to expect; and it was too brief in nature to give Defendant Broekema a realistic opportunity

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

to intervene in it, so as prevent the one punch and possibly few kicks that Plaintiff presumably experienced.[FN16]

> FN16. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (noting that "three blows [that occurred] in such rapid succession ... [is] not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator"); *Blake v. Base,* 90–CV–0008, 1998 WL 642621, at *13 (N.D.N.Y. Sept.14, 1998) (McCurn, J.) (dismissing failure-to-intervene claim against police officer based on finding that the punch to the face and few body blows that plaintiff allegedly suffered "transpired so quickly ... that even if defendant ... should have intervened, he simply did not have enough time to prevent plaintiff from being struck"); *Parker v. Fogg,* 85–CV–0177, 1994 WL 49696, at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.) (holding that an officer is not liable for failure-to-intervene if there "was no 'realistic opportunity' to prevent [an] attack [that ends] in a matter of seconds"); *see also Murray–Ruhl v. Passinault,* 246 F. App'x 338, 347 (6th Cir.2007) (holding that there was no reasonable opportunity for an officer to intervene when one officer stood by while another fired twelve shots in rapid succession); *Ontha v. Rutherford Cnty., Tennessee,* 222 F. App'x 498, 506 (6th Cir.2007) ("[C]ourts have been unwilling to impose a duty to intervene where ... an entire incident unfolds 'in a matter of seconds.' "); *Miller v. Smith,* 220 F.3d 491, 295 (7th Cir.2000) (noting that a prisoner may only recover for a correction's officer's failure to intervene when that officer "ignored a realistic opportunity to intervene").

Finally, based on the current record, the Court rejects Defendants' third argument (i.e., that Plaintiff's excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"). Defendants argue that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant DeLuca was present during the use of force

against Plaintiff (let alone that Defendant DeLuca used force against Plaintiff). This is because Plaintiff's basis for bringing his excessive-force claim against Defendant DeLuca is that he remembered being assaulted by three individuals, including Defendants Dinelle and Duckett, whose last names began with the letter "D." While this fact is undisputed, it is also undisputed that Defendant DeLuca was interviewed by the Inspector General's Office regarding his involvement in the incidents giving rise to Plaintiff's claims,[FN17] and that both Defendant Broekema's use-of-force report, and Defendant Broekema's Facility Memorandum, state that Defendant DeLuca participated in the use of force against Plaintiff.[FN18] Based on this evidence, a rational factfinder could conclude that Defendant DeLuca violated Plaintiff's Eighth Amendment rights. As a result, Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca survives Defendants' motion for summary judgment. The Court would add only that, although it does not construe Plaintiff's Complaint as alleging that Defendant DeLuca failed to intervene in the use of force against Plaintiff, assuming, (based on Plaintiff's motion papers) that Plaintiff has sufficiently alleged this claim, the claim is dismissed because the entirety of the record evidence as it pertains to Defendant DeLuca establishes that he used force against Plaintiff.

> FN17. (Dkt. No. 27, Attach. 2, at 19–20.)

> FN18. (Dkt. No. 27, Attach. 2, at 10, 14.)

**C. Plaintiff's Claim Under the Fourteenth Amendment**

**\*10** As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Defendants did not deprive Plaintiff of his liberty rights. As stated above in note 2 of this Decision and Order, Plaintiff failed to address Defendants' argument that his substantive due process claim should be dismissed. As a result, as stated above in Part III.B. of this Decision and Order, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou,* 2011 WL 4344025, at *11.

After carefully considering the matter, the Court finds

that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, although the record evidence establishes that Plaintiff was confined in SHU for 150 days as a result of the misbehavior reports issued by Defendants Norton and Duckett, Plaintiff has failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this 150-day period were more severe than normal SHU conditions.[FN19] As a result, Plaintiff's substantive due process claim is dismissed.

> FN19. *See Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (finding that 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217–19 (W.D.N.Y.1998) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353–56 (W.D.N.Y.1997) (161 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96–CV–2003, 1997 WL 137448, at *4–6 (S.D.N.Y.1997) (192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116–17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94–CV–4094, 1996 WL 487951, at *4–5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103–04 (W.D.N.Y.1995) (270 days in SHU under numerous conditions of confinement that

were more restrictive than those in general population).

**D. Defendants' Defense of Qualified Immunity**

As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of Plaintiff's claims on the alternative ground that they are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances.

**1. Retaliation**

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [1982] ). Here, even assuming that Plaintiff's statement that he would contact an attorney regarding the use of force he experienced constitutes engagement in protected activity, and even also assuming that the only reason Defendant Norton and/or Duckett issued Plaintiff a misbehavior report was because he made this statement, these Defendants are, under the circumstances, entitled to qualified immunity. This is because the Court finds that the right to make this statement (without experiencing any resulting adverse action) was not a clearly established during the time in question (January 2009), based on a review of the relevant case law. *See, supra,* notes 12 and 13 of this Decision and Order.

As a result, Plaintiff's retaliation claim is dismissed on the alternate ground of qualified immunity.

**2. Excessive Force**

There is no doubt that the right to be free from the use of excessive force was "clearly established" at the time of the incidents giving rise to Plaintiff's claims. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Moreover, with regard to whether it was objectively reasonable for Defendants to use the alleged amount of force that they used, the Second Circuit has made clear that, "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002) [internal quotation marks omitted].

**\*11** Here, after carefully reviewing the record, and construing it in the light most favorable to Plaintiff, the Court finds that, even if Defendants Dinelle, DeLuca and Duckett genuinely feared being assaulted by Plaintiff, and even if those three Defendants genuinely perceived Plaintiff's words and movements to constitute an attempt to resist a frisk, admissible record evidence exists from which a rational jury could conclude that those perceptions were not objectively reasonable under the circumstances. As the Second Circuit has observed, it is impossible to "determine whether [Defendants] reasonably believed that [their] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded." *Thomas v. Roach,* 165 F.3d 137, 144 (2d Cir.1999).[FN20] For these reasons, the Court rejects Defendants' argument that Plaintiff's excessive-force claim should be dismissed on the ground of qualified immunity as it relates to Defendants Dinelle, DeLuca and Duckett.

> FN20. *See also Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ( "[T]he parties have provided conflicting accounts as to [who] initiated the use of force, how much force was used by each, and whether [the arrestee] was reaching toward [a weapon]. Resolution of credibility conflicts and the choice between these conflicting versions are matters for the jury and [should not be] decided by the district court on summary judgment.").

However, the Court reaches a different conclusion with regard to Plaintiff's failure-to-intervene claim against Defendant Broekema: the Court finds that, at the very least, officers of reasonable competence could disagree on the legality of Defendant Broekema's actions, based on the current record. As a result, Plaintiff's failure-to-intervene claim against Defendant Broekema is dismissed on this alternative ground.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial

summary judgment (Dkt. No. 24) is ***GRANTED*** in part and ***DENIED*** in part in the following respects:

(1) Defendants' motion for summary judgment on Plaintiff's First Amendment claim is ***GRANTED;***

(2) Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim is ***GRANTED;***

(3) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton is ***GRANTED;***

(4) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema is ***GRANTED;*** and

(5) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca is ***DENIED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED*** **with prejudice** from this action:

(1) Plaintiff's First Amendment claim;

(2) Plaintiff's Fourteenth Amendment substantive due process claim;

(3) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton; and

(4) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema; and it is further

**ORDERED** that Defendants Norton and Broekema are ***DISMISSED*** from this action; and it is further

**ORDERED** that, following this Decision and Order, the following claims remain pending in this action: Plaintiff's Eighth Amendment excessive-force claim against Defendants DeLuca, Dinnelle and Duckett; and it is further

**\*12 ORDERED** that counsel are directed to appear

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 5975027 (N.D.N.Y.)

(Cite as: 2011 WL 5975027 (N.D.N.Y.))

on **JANUARY 4, 2012 at 2:00 p.m.** in chambers in Syracuse, N.Y. for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **DECEMBER 16, 2011,** and the parties are directed to engage in meaningful settlement negotiations prior to the 1/4/12 conference.

N.D.N.Y.,2011.

Henry v. Dinelle
Slip Copy, 2011 WL 5975027 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

KeyCite Red Flag - Severe Negative Treatment

Affirmed in Part, Vacated in Part, Remanded by Xu-Shen Zhou
v. State University of New York Institute of Technology, 2nd Cir.
(N.Y.), October 10, 2012

2011 WL 4344025
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

XU–SHEN ZHOU, a/k/a Jason Zhou, Plaintiff,
v.
S.U.N.Y. INST. OF TECH.; Dr. Lisa
Beradino; Dr. Stephen Havlovic; Dr. William
Langdon; and Dr. Peter Spina, personally
and in their official capacities, Defendants.

No. 6:08–CV–0444 (GTS/ATB).
|
Sept. 14, 2011.

Attorneys and Law Firms

Satter & Andrews LLP, Ross P. Andrews, Esq., of
Counsel, Syracuse, NY, for Plaintiff.

Hon. Eric. T. Schneiderman, Attorney General for the
State of New York, Christina L. Roberts–Ryba, Esq.,
Douglas J. Goglia, Esq., Susan C. Von Reusner, Esq., of
Counsel, Albany, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this employment
discrimination action filed by Xu–Shen Zhou ("Plaintiff")
against the State University of New York Institute
of Technology, Dr. Lisa Berardino, Dr. Stephen
Havlovic, Dr. William Langdon, and Dr. Peter Spina
("Defendants"), is Defendants' motion for summary
judgment. (Dkt. No. 69.) For the reasons set forth below,
Defendants' motion is granted, and Plaintiff's Amended
Complaint is dismissed.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Claims**

Generally, liberally construed, Plaintiff's Amended
Complaint alleges that Plaintiff, a person of Chinese
nationality and origin, was subject to discrimination
during his employment at the State University of
New York Institute of Technology ("SUNY IT"). (*See
generally* Dkt. No. 28 [Plf.'s Am. Compl.].) More
specifically, Plaintiff alleges as follows.

Beginning in August 2005, Defendant Langdon, who
was Plaintiff's supervisor, harassed and intimidated
Plaintiff by (1) making "repeated negative comments
about China and persons of Asian origin," (2) seeking
"to have plaintiff do the work for a scholarly
publication but include Langdon's name [on that
publication]," (3) "encourag[ing] students to make
complaints against plaintiff," (4) telling Plaintiff that
he could assist Plaintiff with student complaints "if
plaintiff helped [him] get a paper published," (5)
"unfairly criticizing plaintiff's teaching," (6) "behaving
in a menacing manner," and (7) "recommending against
plaintiff's reappointment." (*Id.*) Plaintiff complained
about Defendant Langdon's behavior to human resources
on June 29, 2006, and to Defendant Havlovic on July 6,
2006. (*Id.*) Defendant Berardino also "knew of Plaintiff's
complaints of unlawful discrimination."

During Plaintiff's meeting with Defendant Havlovic,
Defendant Havlovic "assured Plaintiff that the complaints
that had been made by a few students about
Plaintiff was a closed issue." (*Id.*) After this meeting,
Defendant Havlovic "began to exaggerate the import
of those student complaints ... and opposed plaintiff's
reappointment." (*Id.*)

Despite Plaintiff's complaints, SUNY IT "failed or
refused to take appropriate action to remedy the
hostile working environment." (*Id.*) Instead, Defendants
"retaliated against plaintiff [by] ... refusing to renew his
employment contract." (*Id.*) Defendant Spina also "stated
in front of faculty members 'We do not want foreigners'
or words to that affect"; and it was her decision not to
recommend Plaintiff for reappointment that lead to his
termination. (*Id.*)

Based on these (and other) factual allegations, the Court
liberally construes Plaintiff's Amended Complaint as
asserting the following three claims: (1) a claim of national
origin and/or race discrimination under Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e

*et seq.* ("Title VII"), 42 U.S.C. § 1981, and Section 292 of the New York State Human Right's Law ("NYHRL"); (2) a claim of hostile work environment based on national origin and/or race under Title VII, 42 U.S.C. § 1981, and Section 292 of the NYHRL; and (3) a claim of retaliation based on national origin and/or race under Title VII, 42 U.S.C. § 1981, and Section 292 of the NYHRL. (*Id.*) Familiarity with the remaining factual allegations supporting these claims in Plaintiff's Amended Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

**B. Undisputed Material Facts**
 **\*2** The following material facts are not in dispute. (*Compare* Dkt. No. 69, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 78, Attach. 7 [Plf.'s Rule 7.1 Response].)

**1. Plaintiff's Initial Employment with SUNY IT**
SUNY IT is a college within the educational system of New York State. In or around July 2005, Plaintiff applied for a position at SUNY IT to teach finance as a faculty member in the School of Business. Plaintiff was initially interviewed over the telephone, and was subsequently interviewed in person during a campus visit. When Plaintiff was interviewing at SUNY IT, he did not disclose that he had received complaints from students about his teaching at Bloomsburg University.

On July 19, 2005, Dr. Peter Spina, the Interim President at SUNY IT, sent to Plaintiff an initial offer of employment, which was contingent upon official notification from the U.S. Citizenship and Immigration Services that Plaintiff had authorization to work at SUNY IT. Plaintiff's employment was scheduled to begin on September 1, 2005, and the offer was for a two-year appointment. Dr. Steven Havlovic, Dean of the School of Business and tenured Professor of Human Resource Management, endorsed the hiring of Plaintiff.

Sometime after Plaintiff began teaching at SUNY IT, students in his class made complaints about him. During the summer of 2006, Plaintiff went on a car ride with Dr. Langdon, a full professor at SUNY IT who served (with all the tenured professors in the School of Business) on the School of Business Review Peer Committee. During the car ride, Dr. Langdon explained to Plaintiff that he and Dean Havlovic had received complaints regarding

Plaintiff's teaching style. Dr. Langdon also told Plaintiff that he and another professor were working on a research project, and indicated that he could use Plaintiff's help.

Shortly after the car ride, Dr. Langdon called Plaintiff, who informed Dr. Langdon that he was not interested in working on the research project. Plaintiff also contacted Dean Havlovic and Anthony Panebianco, Associate Vice President of Human Resources, to complain about the car ride. Dean Havlovic advised Plaintiff that he was not required to work on papers that he did not wish to work on. Dean Havlovic subsequently contacted Dr. Langdon, and instructed Dr. Langdon not to take employees on car rides.

During the fall of 2006, Dr. Langdon was contacted by Dean Havlovic, who informed Dr. Langdon that he had received additional complaints regarding Plaintiff's teaching. By the same point in time, Dr. Langdon also had received written complaints from students regarding Plaintiff's teaching. One student requested to withdraw from Plaintiff's class on account of Plaintiff's limited English language skills. The student stated, "I cannot comprehend [Plaintiff because he] speaks very broken English and most of my class has no idea what he is saying."

**2. Plaintiff's Application for Renewal**
Also during the fall of 2006, Plaintiff's teaching contract was up for renewal. Plaintiff, along with two other candidates, put in applications for two-year renewals. As Dean of the School of Business, Dr. Havlovic sent Plaintiff a memorandum outlining the steps for renewal. The memorandum included a recommended timetable for the Personnel Actions. The memorandum stated that faculty members who were being reviewed would be notified by the appropriate Dean and instructed to complete and/or update their personnel files. Those who wished to have an advocate needed to send the notification by a certain date. The memorandum also outlined the committees that were set up for the review process.

 **\*3** Prior to the President of SUNY IT making a final decision on renewal or non-renewal of a faculty member, it is SUNY IT's practice to receive recommendations from the School's Personnel Committee, the College–Wide Personnel Committee, the Dean, and the Vice President for Academic Affairs. Dr. Lisa Berardino, Associate Professor for the Department of Business,

along with two other professors, Robert Yeh and Ed Petronio, served on the School of Business Personnel Committee (hereinafter "Personnel Committee"). The Personnel Committee served to coordinate the faculty review of professors who are up for employment renewal on behalf of the School of Business Peer Review Committee (hereinafter "Peer Review Committee"). The guidelines that govern the review of professors that are up for renewal are entitled "The State University of New York Policies of the Board of Trustees."

### 3. Personnel Review Committee's Evaluation, Recommendation and Subsequent Action

Pursuant to SUNY IT guidelines regarding the renewal of faculty members, the Personnel Committee was required to organize the three candidates' materials, review them, and ultimately make a recommendation to the Peer Review Committee. Before making their recommendation, Dr. Yeh and Dr. Berardino met to discuss the review of the three candidates. Although Mr. Petronio was invited to the meetings, was a part of the Personnel Committee's recommendation, signed the Personnel Committee's letters, and as was kept informed by Dr. Berardino as to the status of the review process, he was not present for the meetings because he was traveling during most of the review period.

With regard to the standard of review pertaining to the contractual renewal determination, the following five criteria were considered: (i) the candidate's terminal degree; (ii) the candidate's teaching ability and effectiveness; (iii) the candidate's research; (iv) the candidate's university service; and (v) professional development. Under normal circumstances, professors are renewed for two years if the review results in a determination that the candidate is meeting the relevant criteria.

To ascertain effectiveness in teaching, among other things, the Personnel Committee reviewed each candidate's Individual Development and Educational Assessment scores (hereinafter "IDEA"). The IDEA rating system allows students to rate professors by soliciting feedback and evaluating teaching. The scale for IDEA scores goes from one-to-five. A score of one is very bad while a score of five is great. The Personnel Committee also considered a portfolio, put together by the candidate, with information from his or her perspective on each of these

categories, along with written complaint from students (if any).

Plaintiff's IDEA scores were not great. In addition, Plaintiff had received written complaints from students. Nonetheless, Dr. Berardino visited with Ken Wallace, Plaintiff's advocate, and told him that the Personnel Committee was planning to propose a one year renewal. Mr. Wallace indicated that was fine. The Personnel Committee then recommended to the Peer Review Committee that Plaintiff be renewed for one year.

### 4. Peer Review Committee's Evaluation, Recommendation and Subsequent Action

**\*4** The Peer Review Committee, which consisted of eight tenured professors from the business department, met to review the recommendation made by the Personnel Committee. Dr. Berardino was also part of the Peer Review Committee. At the meeting, Robert Orilio, the Undergraduate Coordinator, and William Langdon, the Coordinator of Finance, each expressed his concerns about Plaintiff's inability to teach undergraduate students. A discussion ensued about how the students were being harmed and how they were not learning. Ultimately, the Peer Review Committee rejected the recommendation for a one-year renewal in a vote of 6–2. The rejection of the appointment was based on Plaintiff's weak IDEA evaluations, student complaints, and the comments by coordinators Will Langdon and Dr. Robert Orilio. Dr. Berardino was one of the six faculty members to vote not to renew Plaintiff for a one-year term.

After the Peer Review Committee voted against renewing Plaintiff's contract, the Personnel Committee was required to send this recommendation to the College–Wide Academic Personnel Committee (hereinafter "College–Wide Committee"), which consisted of tenured faculty members across the different schools and areas of SUNY IT. Dr. Berardino prepared a draft memorandum that she circulated by email message to the other two members of the Personnel Committee for their review. The memorandum was then printed, circulated to the three members of the Personnel Committee for their signatures, and sent to the chair of the College–Wide Committee. Dr. Havlovic also received a copy of a memorandum, dated October 31, 2006, which stated that, although the Personnel Committee had recommended a one-year renewal of Plaintiff's application, the Peer

Review Committee had rejected the appointment by a vote of 6–2.

### 5. College–Wide Committee's Evaluation and Recommendation

After the Peer Review Committee sent the recommendation of non-renewal to the College–Wide Committee, the College–Wide Committee held a meeting, which resulted in a request that Plaintiff's letter, along with the letters for other candidates, be revised. With respect to Plaintiff, the College–Wide Committee asked for more information about the student complaints and Plaintiff's teaching performance.

Dr. Berardino followed up on the instructions of the College–Wide Committee by emailing requests for more information to Dean Havlovic, Ken Wallace, Robert Orilio, and Will Langdon. Specifically, Dr. Berardino requested more information about Plaintiff's teaching performance. The Dean indicated the he would be sending his own letter to the Interim Vice President of Academic Affairs, Rosemary Mullick.

Dr. Berardino also sent an e-mail message to each of the three candidates, and asked them to help with the memorandum that the Personnel Committee would be sending to the College–Wide Committee. Plaintiff responded to the e-mail message by providing a small amount of background information.

On November 14, 2006, Dr. Berardino submitted a revised letter on behalf of the Personnel Committee to the College–Wide Committee. On November 15, 2006, Dr. Langdon prepared a letter to the College–Wide Committee detailing his concerns about Plaintiff's teaching. In the letter, Dr. Langdon stated, in part, that "[Plaintiff's] difficulties speaking the English language preclude his effectively communicating with students in a class room setting." In addition, he wrote, "to recommend [Plaintiff] for reappointment would, in my opinion, render a great disservice to students in the School of Business as well as to Dr. Zhou. His research interest and productivity would potentially be more fully utilized, and more fulfilling to all parties involved, at an institution less oriented to teaching."

**\*5** After receiving these letters, the College–Wide Committee met again. At this second meeting, Robert Yeh informed the College–Wide Committee members that

William Langdon had a personal conflict with Plaintiff, which effected the information Langdon provided. During their meeting, the College–Wide Committee asked Dr. Berardino (who was a member of the College–Wide Committee) about her observation of Plaintiff's teaching. Dr. Berardino reported Plaintiff's teaching as "average." The College–Wide Committee ultimately voted 4–1 not to support the Peer Review Committee's vote for non-renewal of Plaintiff's application. Dr. Berardino was the member of the College–Wide Committee who voted against the renewal.

### 6. Vice President Mullick's Evaluation and Recommendation

On November 15, 2006, in response to Dr. Berardino's request for more information about Plaintiff's teaching, Dean Havlovic sent a letter to Dr. Mullick, which stated, in part, that Plaintiff continued to struggle as a finance instructor, that his teaching ratings for his undergraduate courses declined from a 3.1 average in the fall of 2005 to an average of 2.4 in the spring of 2006, and that, as a result, he concurred with the recommendation of the School of Business tenured faculty that Plaintiff's contract not be renewed.

After receiving the memorandum from Dean Havlovic regarding Plaintiff's renewal, Dr. Mullick had conversations with Dean Havlovic, who discussed his level of concern regarding the student complaints about Plaintiff's teaching. During their conversations, Dean Havlovic referred to email messages from students, as well as petitions, where students asked to be removed from the class and reimbursed.

Based on Dr. Mullick's personal review of Plaintiff's file, the student complaints, and the recommendations of non-renewal by the Dean and the tenured faculty in the School of Business, Dr. Mullick recommended that Plaintiff not be reappointed as Assistant Professor of Finance. She sent her recommendation to the Interim President, Dr. Peter Spina, in a memorandum dated November 27, 2006. Dr. Mullick's recommendation not to renew Plaintiff was based entirely on the information that she received regarding Plaintiff's inability to effectively teach the students at SUNY IT.

### 7. President Spina's Decision

In a letter dated December 11, 2006, Dr. Spina informed Plaintiff that his "term appointment" as Assistant Professor of Finance at SUNYIT would be terminated on August 31, 2007. Dr. Spina's decision not to renew Plaintiff's contract was based in large part on the recommendation of Dr. Mullick. Dr. Spina also heavily relied upon the recommendation from Dean Havlovic, who eventually removed Plaintiff from teaching in his final semester, replacing him with another professor.

### 8. SUNY IT's Discrimination Complaint Procedure

SUNY IT has a Discrimination Complaint Procedure that was in place prior to, and during, Plaintiff's entire term of employment with SUNY IT. The procedure is available to all SUNY IT students, employees and to the public on the school's web page. The procedure "provides a mechanism through which the University may identify, respond to, and prevent incidents of illegal discrimination." The procedure requires employees to "file a written complaint with the affirmative action officer within 90 calendar days following the alleged discriminatory act or the date on which the complainant first knew or reasonably should have known of such act."

**\*6** SUNY IT also has a faculty handbook, which is available through the college's website. The handbook also states how to file a complaint based on discrimination.

While at SUNYIT, Plaintiff had access to the Discrimination Complaint Procedure. In addition, Plaintiff had access to the faculty handbook. However, throughout his employment at SUNY IT, Plaintiff never filed any formal complaints regarding discrimination or any other matter. The only time Plaintiff discussed any concern with Mr. Panebianco was after the car ride with Dr. Langdon, and Plaintiff never went back to Mr. Panebianco's office to follow up on the one conversation they had.

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties. (*Id.*)

### C. Defendants' Motion

Generally, in support of their motion for summary judgment, Defendants argue, *inter alia,* as follows: (1) Plaintiff's claim of discrimination based on race and/or national origin should be dismissed because the record shows that Plaintiff's national origin and/or race was not a factor that motivated Defendants' employment actions; (2) Plaintiff's claim of hostile work environment based on race and/or national origin should be dismissed because the record shows that Plaintiff never formally complained of a hostile work environment, and one isolated incident does not establish a hostile work environment; (3) Plaintiff's claim of retaliation based on race and/or national origin should be dismissed because the record shows that Plaintiff's national origin and/or race was not a factor that motivated Defendants' employment actions; (4) Plaintiff's discrimination and retaliation claims should be dismissed, in the alternative, because SUNY IT had a discrimination policy in effect that was available to all faculty at the time Plaintiff was allegedly discriminated against, and Plaintiff unreasonably failed to follow that policy; and (5) Plaintiff's request for compensatory damages, back pay, or front pay should be dismissed, in the alternative, pursuant to the "after-acquired evidence doctrine" because the record shows that, had Defendants been aware of Plaintiff's poor teaching ratings at Bloomsburg University during the hiring process, Plaintiff never would have been offered employment. (*See generally* Dkt. No. 70, Attach. 1 [Defs.' Memo. of Law].)

In response to Defendants' motion for summary judgment, Plaintiff argues, *inter alia,* as follows: (1) his claim of discrimination based on race and/or national origin should not be dismissed because he has (a) established a prima facie case of discrimination, and (b) adduced record evidence from which a rational factfinder could conclude that Defendants' purported nondiscriminatory reason for not renewing his employment contract is pretextual; (2) his claim of retaliation based on race and/or national origin should not be dismissed because he has (a) established a prima facie case of retaliation, and (b) adduced record evidence from which a rational factfinder could conclude that Defendants' purported non-discriminatory reason for not renewing his employment contract is pretextual; and (3) Defendants arguments that they are entitled to a "same actor" presumption, and that the "after acquired evidence" and *Farragher Ellert* defenses apply, are without

merit. (*See generally* Dkt. No. 78, Attach. 5 [Plf.'s Reply Memo. of Law].)

**\*7** In reply to Plaintiff's response, Defendants (in addition to reiterating previously advanced arguments) argue, *inter alia,* that the Court should disregard the several qualifying statements provided by Plaintiff in his Rule 7.1 Response. (*See generally* Dkt. No. 82 [Defs.' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at \*2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

Again, because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standards governing Plaintiff's claims in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which (again) is intended primarily for review by the parties. (Dkt. No. 70, Attach. 1 [Defs.' Memo. of Law]; Dkt. No. 78, Attach. 5 [Plf.'s Reply Memo. of Law]; Dkt. No. 82 [Defs.' Reply Memo. of Law].)

## III. ANALYSIS

### A. Plaintiff's Claim of National Origin and/or Racial Discrimination Under Title VII, Section 1981, and the NYHRL [1]

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's discrimination claim because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that the non-renewal of his employment contract was

discriminatory. Based on the current record, the Court agrees with Defendants.

Claims of national origin and/or racial discrimination are governed by the burden-shifting analysis announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "Under the burden-shifting rules set forth in *McDonnell Douglas* ..., a plaintiff has the initial burden of making out a prima facie case of discrimination." *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001). For purposes of a Title VII disparate treatment claim, a plaintiff may do so by demonstrating "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold v. New York,* 366 F.3d 138, 152 (2d Cir.2004) (citing *Collins v. New York City Transit Auth.,* 305 F.3d 113, 118 [2d Cir.2002] ). The plaintiff's burden of establishing a prima facie case for discrimination "is not onerous .... [but] serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**\*8** "If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination." *Farias,* 259 F.3d at 98. "The defendant is not required to prove that the articulated reason actually motivated its actions." *Id.* "If the defendant fails to discharge the burden by presenting a nondiscriminatory reason, the plaintiff will prevail (assuming the other aspects of the prima facie case are not contested)." *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000).

"If the defendant bears its burden of production, the presumption drops out of the analysis ... and the defendant 'will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.' " *Farias,* 259 F.3d at 98 (quoting *James,* 233 F.3d at 154). "Evidence that the defendant's articulated nondiscriminatory reason is false, when added to the prima facie case, may or may not be 'sufficient to support a reasonable inference

that prohibited discrimination occurred' and warrant submitting the case to the jury." *Id.* (quoting *James,* 233 F.3d at 156).

Here, with regard to the first and third above-described prongs, it is undisputed that (1) Plaintiff is a member of a protected class, and (2) his employment contract was not renewed. [2]

As for the second prong, Plaintiff has adduced record evidence from which a rational factfinder could conclude that he was qualified for the position he held. In fact, Defendants hired Plaintiff, who previously taught at a different University, instead of other applicants; and Dean Havlovic endorsed Plaintiff's hiring.

As for the fourth prong, even when viewing the facts in the light most favorable to Plaintiff, based on the admissible evidence in the record, a rational factfinder could not conclude that the non-renewal of Plaintiff's employment contract occurred under circumstances giving rise to an inference of unlawful discrimination. At best, the record establishes that Defendant Langdon had a conflict with Plaintiff, and that, as a result of this conflict, he voted against recommending Plaintiff for renewal and attempted to influence other faculty members to do the same. However, even viewing the evidence in the record in a light most favorable to Plaintiff, there is no evidence from which a rational factfinder could conclude that this conflict was based on Plaintiff's national origin and/or race. This is because the only evidence in the record regarding Defendant Langdon and Plaintiff's national origin and/or race is as follows: (1) a declaration from Plaintiff that Defendant Langdon made general comments about fearing people of Chinese descent and China being a "Third World Country" in Plaintiff's presence (Dkt. No. 78, Attach. 3, at ¶ 4); (2) testimony from Plaintiff that Defendant Langdon told him that he could not speak to students in the same manner as Tom Alee, an American-born professor, because Plaintiff is Chinese (Dkt. No. 69, Attach. 14, at 151); and (3) testimony from Plaintiff that Defendant Langdon previously "intimidated" two Asian faculty members (Dkt. No. 69, Attach. 14, at 179).

**\*9** With regard to Plaintiff's declaration about Defendant Langdon's general comments regarding China and Chinese people, those comments are vague, without context, and insufficient to establish animus toward

Plaintiff. With regard to Plaintiff's testimony that Defendant Langdon "intimidated" two other Asian faculty members, that testimony was both vague and based on hearsay. Finally, with regard to Plaintiff's testimony that Defendant Langdon made a statement about an American-born professor being able to "say" things to his students that Plaintiff cannot "say," it was at best ambiguous, and at worst evidence that Plaintiff pronounces words other than those he intends to pronounce. (*See also* Dkt. No. 69, Attach. 15, at 152 [pronouncing the word "eagle" but intending to say the word "ego"]; Dkt. No. 69, Attach. 15, at 152–54 [pronouncing the word "brown" but intending to say the word "bound"].)

In any event, even assuming, for the sake of argument, that Plaintiff has adduced record evidence from which a rational factfinder could conclude that Defendant Langdon's conflict with Plaintiff was based on Plaintiff's national origin, and therefore that the non-renewal of Plaintiff's employment contract occurred under circumstances giving rise to an inference of unlawful discrimination, Defendants have articulated legitimate, nondiscriminatory reasons for not renewing Plaintiff's employment with SUNY IT. More specifically, Defendants have adduced admissible record evidence establishing that Plaintiff was not renewed because of his IDEA scores, student complaints, student evaluations, and the recommendations of the Peer Review Committee, Dean Havlovic, and Vice President Mullick. As a result, Plaintiff must point to evidence that reasonably supports a finding of prohibited discrimination.

In an effort to satisfy his burden of demonstrating that Defendants' reasons for non-renewal were pretextual, Plaintiff argues that the admissible record evidence establishes the following: (1) from the fall of 2005 through the spring of 2006, only three student complaints were filed against Plaintiff; (2) two of these complaints were solicited by Defendant Langdon; (3) none of these student complaints were presented to Plaintiff, as required by SUNY IT's applicable grievance procedure or departmental policy (which suggests that the complaints were not taken seriously); (4) in late June and early July 2006, Defendants Langdon and Havlovic each told him that he did not need to worry about the prior student complaints, which were "closed issues"; (5) only one complaint was filed by a student against Plaintiff after he was told not to worry, which was based on

Plaintiff's accent, and was filed after the drop deadline as a justification for seeking late withdrawal; and (6) the student evaluations of Plaintiff were "better" than the student evaluations of a comparator whose contract was renewed.

As an initial matter, as stated above, even assuming that the record establishes that a conflict existed between Plaintiff and Defendant Langdon, a rational factfinder could not conclude, based on the admissible evidence in the record, that Defendant Langdon's conflict with Plaintiff was based on Plaintiff's national origin and/or race.

**\*10** Moreover, even assuming that Defendant Langdon's conflict with Plaintiff was based on Plaintiff's nationality and/or race, contrary to Plaintiff's argument, the admissible evidence in the record does not establish that any student complaints were solicited by Defendant Langdon. Rather, the admissible evidence in the record establishes that students complained to Defendant Langdon on more than one occasion about Plaintiff's teaching, and, in response to those complaints, Defendant Langdon told the students to draft a petition and submit it to the Dean of the School of Business. (Dkt. No. 69, Attach. 7, at 11–14.)

In addition, the fact that Plaintiff was not informed of student complaints in accordance with school policy, and was told not to worry about the complaints filed in the spring of 2006 when he was made aware of them, is not evidence that a subsequent decision not to renew Plaintiff's contract was motivated by Plaintiff's national origin and/or race. This is especially true because Plaintiff does not dispute that additional student complaints were filed after he was allegedly told not to worry about the complaints filed in the spring of 2006.

Furthermore, the evidence in the record establishes as follows: (1) Plaintiff's IDEA scores were not great; (2) professors on the Peer Review Committee other than Defendant Langdon expressed concerns about Plaintiff's teaching; (3) the individual who endorsed Plaintiff's hiring recommended that Plaintiff's contract not be renewed; (4) the individual who hired Plaintiff decided not to renew Plaintiff's employment contract; (5) SUNY IT employs full-time faculty members of Asian and Chinese descent;[3] and (6) while he was a teacher at Bloomberg University, he received negative evaluations about his teaching from

several students, as well as complaints about his English, and the Dean of the College of Business stated in his final performance evaluation that one of his "concerns" was "the significant number of ratings in the C and D categories on [Plaintiff's] student evaluations."[4]

In other words, there is admissible evidence in the record that supports the decision not to renew Plaintiff's contract independent of (and uninfluenced by) Defendant Langdon. In addition, there is no admissible evidence in the record that the student complaints and/or concerns expressed by faculty members other than Defendant Langdon were in any way related to Plaintiff's national origin. Furthermore, finding a lack of discriminatory motive is supported by the above-described "same actor evidence," the fact that SUNY IT employs people of the same ethnic descent as Plaintiff, and the fact that the concerns expressed by Defendant Langdon, other faculty members, and students were shared by faculty members and students at Bloomberg University.[5] Simply put, Plaintiff has failed to point to any admissible record evidence from which a rational factfinder could find prohibited discrimination.

**\*11** As a result, Plaintiff's discrimination claim is dismissed.

## B. Plaintiff's Claim of Hostile Work Environment Based on His Race and/or National Origin Under Title VII, 42 U.S.C. § 1981 and the NHHRL[6]

Defendants argue that, to the extent Plaintiff's Amended Complaint may be construed as asserting a claim of a hostile work environment, that claim should be dismissed because a single incident is insufficient as a matter of law to constitute a hostile work environment. Essentially, Defendants argue that, because Plaintiff has adduced record evidence of only one incident of harassment, Plaintiff's hostile work environment claim must be dismissed. Defendants further argue that, even if his work environment was hostile, Plaintiff's failure to formally complain about the incident of harassment, as required by the employee handbook, is fatal to his hostile-work-environment claim.

In his memorandum of law in opposition to Defendants' motion for summary judgment, Plaintiff does not address Defendants' challenge to his claim of a hostile work environment. For this reason, Defendants' burden, with

regard to their request for dismissal of that claim, is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a "modest" burden. [7] After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only two points.

First, the Court does liberally construe Plaintiff's Amended Complaint as asserting a claim of a hostile work environment. (*See, e.g.,* Dkt. No. 28, ¶¶ 13–14, 15, 16 ["During the course of his employment by SUNY IT, defendants subjected plaintiff to a hostile work environment, which caused plaintiff great emotional distress and adversely affected plaintiff's ability to do his job.... Plaintiff was subjected to the hostile work because of his nationality and race.... The hostile environment included harassing and intimidating conduct by defendant Langdon."].)

Second, under the circumstances, the single incident involving Plaintiff riding in a car with Dr. Langdon, which did not involve a physical assault or any other "extraordinarily severe" conduct, such as intimidating verbal harassment, and which did not deter Plaintiff from teaching the following semester and seeking employment renewal, does not establish a hostile work environment as a matter of law. [8]

As a result, Plaintiff's hostile-work-environment claim is dismissed.

### C. Plaintiff's Claim of Retaliation Based on His Race and/or National Origin Under Title VII, Section 1981 and the NYHRL

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's retaliation claim because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that his non-renewal was retaliatory. Based on the current record, the Court accepts Defendants' argument.

**\*12** "To make out a prima facie case of retaliation, under Title VII, Section 1981 and NYSHRL, a plaintiff must show [the following]: (1) participation in a protected activity known to Defendants; (2) an adverse employment action; and (3) a causal connection between the two."

*Schanfield v. Sojitz Corp. of Am.,* 663 F.Supp.2d 305, 341 (S.D.N.Y.2009) (collecting cases).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz,* 202 F.3d at 566 (noting that a protected activity need not "rise to the level of a formal complaint in order to receive statutory protection"). Protected activities encompass "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). A plaintiff "need not establish that the conduct [he] opposed was in fact a violation of [the law]," *Bush v. Fordham Univ.,* 452 F.Supp.2d 394, 416 (S.D.N.Y.2006), but he must demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Sumner,* 899 F.2d at 209.

Adverse employment action is any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). "[T]ermination is an adverse employment action." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). Similarly, being laid off constitutes adverse employment action. *See Galabya,* 202 F.3d at 640 (2d Cir.2000); *Walker v. City of New York,* 98–CV–2695, 2002 WL 31051534, at \*4 (E.D.N.Y. July 22, 2002) ("Plaintiff's temporary lay-off during the summer of 1997[was] sufficient to meet Plaintiff's burden of putting forth evidence to show that the terms of her employment were altered."). [9]

A plaintiff may establish a casual connection between the protected activity and the adverse employment action "either (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant[,] or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Schanfield,* 663 F.Supp.2d at 343 (citing *Knight v. City of New York,* 303 F.Supp.2d 485, 496 [S.D.N.Y.2004] ).

"Direct evidence giving rise to an inference of discrimination may include 'a showing that the employer criticized the plaintiff's performance in ethnically degrading terms, made invidious comments about others in the employee's protected group, or treated employees

not in the protected group more favorably.' " *Id.* (quoting *Hunter v. St. Francis Hosp.,* 281 F.Supp.2d 534, 542 [E.D.N.Y.2003] ).

In order for a court to "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case," the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing cases finding temporal proximity of three months and more to be insufficient).

**\*13** "Under *McDonnell Douglas,* once the plaintiff has established a prima facie case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, non-discriminatory business rationale to justify its adverse employment action." *Schanfield,* 663 F.Supp.2d at 343. "If the ... defendant ... points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra v. Gen. El. Co.,* 252 F.3d 205, 216 (2d Cir.2001).

Here, Plaintiff argues that complaining to Dean Havlovic and Anthony Panebianco, Associate Vice President of Human Resources, about Defendant Langdon taking him for a car ride constitutes engagement in protected activity. Plaintiff further argues that he has established a casual connection between this protected activity and the adverse action that he suffered.

As an initial matter, the Court rejects Plaintiff's argument that his complaint constitutes protected activity. Although Plaintiff testified (vaguely) that he "report[ed] to Dr. Havlovic [Defendant Langdon's] behavior of coercion, harassment and discrimination," and "mentioned the pattern of what [Defendant Langdon] did to ... other Asian people," Plaintiff also testified that he did not expressly use the word "discrimination," mention his national origin, or indicate that he felt Defendant Langdon was treating him with discriminatory animus. (Dkt. No. 69, Attach. 14, at 175–80.) Rather, Plaintiff essentially told Dean Havlovic and Anthony

Panebianco that, during a car ride, Defendant Langdon "demanded" or attempted to "coerce" Plaintiff into assisting him with a publication. (*Id.*) In other words, a rational factfinder could not conclude, based on Plaintiff's vague testimony about "other Asian people," that Plaintiff accused Defendant Langdon of subjecting him to discrimination on the basis of his national origin and/or race during the car ride. (*Id.*)

In addition, even assuming, for the sake of argument, that Plaintiff's complaint can be deemed to have been a protest against discrimination (such that Plaintiff has established a prima facie case of retaliation), [10] as stated above in Part III.A. of this Decision and Order, Defendants have articulated legitimate, nondiscriminatory reasons for non-renewal. More specifically, Defendants have adduced admissible record evidence establishing that Plaintiff was not renewed because of his IDEA scores, student complaints, student evaluations, and the recommendations of the Peer Review Committee, Dean Havlovic, and Vice President Mullick. As a result, Plaintiff must point to evidence that reasonably supports a finding of prohibited discrimination.

In an effort to satisfy his burden of demonstrating that Defendants' reasons for not renewing him were pretextual, Plaintiff restates the arguments that he advanced regarding his discrimination claim. This Court has already rejected these arguments. *See, supra,* Part III.A. of this Decision and Order.

**\*14** As a result, Plaintiff's retaliation claim is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 69) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 28) is ***DISMISSED.*** The clerk of the Court is directed to enter judgment in favor of the defendants and close this case.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4344025

Footnotes

1    "Courts require the same standards and burdens of proof for claims brought under Title VII, § 1981, and the NYHRL." *Ayton v. Lenox Hill Hosp.,* 93–CV–6601, 1997 WL 10000, at *1 n. 1 (S.D.N.Y. Jan.9, 1997) (collecting cases).

2    The Court agrees with Plaintiff that "non-renewal of an employment contract constitutes an adverse employment action for purposes of Title VII." *Liebowitz v. Cornell Univ.,* 584 F.3d 487, 500–501 (2d Cir.2009).

3    (Dkt. No. 69, Attach. 15, at 2.)

4    (Dkt. No. 69, Attach. 14, at 35, 41–42, 47–50, 53–54.)

5    *See Rolle v. Worth Cnty. Sch. Dist.,* 128 F. App'x 731, 733 (11th Cir. Apr.19, 2005) ("Reviewing the evidence, the only possible evidence of motive relates to a single Board member, but an improper motive of one member does not impart discrimination on the entire Board.... Additionally, the fact that the Board hired other minorities negates any showing of pretext."); *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire."); *Alexander v. Gerhardt Enter., Inc.,* 40 F.3d 187, 196 (7th Cir.1994) (finding that "evidence that [plaintiff] had encountered employment difficulties with previous employers" supported conclusion that defendant had offered legitimate, nondiscriminatory reason for plaintiff's discharge, but affirming "district court's implicit finding that [defendant]'s proffered reasons were pretextual and that its actual reasons were retaliatory"); *cf. Cutshall v. Potter,* 347 F.Supp.2d 228, 237 (W.D.N.C.2004) ("[T]he fact that an employer offered a promotion to a member of one race creates a powerful inference that the failure to offer the same promotion to another employee of the same race was not motivated by race discrimination.").

6    "Hostile work environment claims under Title VII, § 1981[and] NYSHRL ... are ... analyzed using the same standard." *Jean–Louis v. Am. Airlines,* 08–CV–3898, 2010 WL 3023943, at *9 n .12 (E.D.N.Y. July 30, 2010).

7    *See Rescuecom Corp. v. Chumley,* 07–CV–0690, 2011 WL 2791272, at *3 & n. 4 (N.D.N.Y. July 14, 2011) (Suddaby, J.) (collecting authorities); *cf. Frink Am., Inc. v. Champion Road Mach. Ltd.,* 48 F.Supp.2d 198, 209 (N.D.N.Y.1999) ("Plaintiff does not address these claims in its opposition papers, leading the Court to conclude that it has abandoned them.") (McAvoy, J.); *Singleton v. City of Newburgh,* 1 F.Supp.2d 306, 312 (S.D.N.Y.1998) (deeming plaintiff's claim "abandoned" and granting defendants' motion for summary judgment where claim was alleged in the complaint but "not raised elsewhere in the record"); *Nat'l Commc'n Ass'n, Inc. v. Am. Tel. & Tel. Co.,* 92–CV–1735, 1998 WL 118174, at *28 (S.D.N.Y. Mar.16, 1998) (plaintiff's claim deemed "abandoned" and defendant granted summary judgment where plaintiff did not address claim in response to defendant's summary judgment motion); *Anti–Monopoly, Inc. v. Hasbro, Inc.,* 958 F.Supp. 895, 907 n. 11 (S.D.N.Y.1997) ( "[T]he failure to provide argument on a point at issue constitutes abandonment of the issue."), *aff'd,* 130 F.3d 1101 (2d Cir.1997).

8    *See, e.g., Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175, 183–85 (W.D.N.Y.2010) (holding that female deputy sheriff jailor was not subjected to gender based hostile work environment under Title VII or New York State Human Rights Law based on single incident of being subjected to graphic live sex in the workplace); *Kennedy v. J.P. Morgan Chase & Co.,* 325 F.Supp.2d 401, 409 (S.D.N.Y.2004) (finding that single incident of vice-president of company, entering African–American employee's work area, dressed in a "robber baron" costume with a top hat and cane, approaching employee's desk, and slamming his cane repeatedly on the floor, loudly questioning the presence of "black people" within the company, was not sufficiently severe to support employee's hostile work environment claim); *Samuels v. New York State Dep't of Corr. Servs.,* 94–CV–8645, 1997 WL 253209, at *7 (S.D.N.Y. May 14, 1997) (granting summary judgment, dismissing claim that a single incident of defendant poking plaintiff in the breast created a hostile work environment); *cf. Patterson v. Cnty. of Oneida,* 375 F.3d 206, 230 (2d Cir.2004) (finding that "[a]lthough a single incident ordinarily will not give rise to a cognizable claim for hostile work environment, [an] alleged event [that] included not only racial remarks but also a physical assault" created a question for the factfinder).

9    *Cf. Leibowitz v. Cornell Univ.,* 584 F.3d 487, 501 (2d Cir.2009) ("An employee seeking a renewal of an employment contract, just like a new applicant or a rehire after a layoff, suffers an adverse employment action when an employment opportunity is denied and is protected from discrimination in connection with such decisions under Title VII and the ADEA.").

10    It is undisputed that Defendant Langdon decided not to recommend Plaintiff for renewal within a close time period to him learning about Plaintiff's complaint.

---

     © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.    11



Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mark LABOUNTY, Plaintiff,
v.
Philip COOMBE, Jr., Wayne Strack, and Donald
Selsky, Defendants.
No. 95 CIV 2617(DLC).

Dec. 26, 2001.
Mark LaBounty, Pro Se, Marcy Correctional Facility,
Marcy, for Plaintiff.

Michael J. Keane, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, for Defendants.

OPINION AND ORDER

COTE, District J.

*1 On April 17, 1995, Mark LaBounty ("LaBounty"),
who is presently incarcerated at Marcy Correctional
Facility, brought this action *pro se* pursuant to 42 U.S.C.
§ 1983 ("Section 1983"), alleging that the defendants
violated his constitutional rights while he was an inmate at
Fishkill Correctional Facility ("Fishkill"). On November
25, 1996, the Court granted in part the defendants' motion
to dismiss. On February 5, 2001, the Court of Appeals for
the Second Circuit vacated in part the November 25, 1996
decision, and remanded LaBounty's procedural due
process claim for further development.[FN1] This claim stems
from LaBounty's wrongful confinement in "SHU" for 30
days, a claim that this Court had dismissed for failure to
identify a violation of a liberty interest. After discovery,
defendants now move for summary judgment. For the
reasons set forth below, the motion is denied.

FN1. The claims brought by the plaintiff that
survived summary judgment were tried before a
jury on October 4, 1998. On October 6, 1998,
the jury returned a verdict for LaBounty on his
claim that Nurse Millie Rivera had been

deliberately indifferent to his serious medical
needs and awarded him $1 in nominal damages.
The Second Circuit denied the appeals from the
trial and the summary judgment opinion, but
reversed the dismissal of the due process claim at
issue here. *LaBounty v. Kinkhabwala,* No.
99-0329, 2001 WL 99819 (2d Cir. Feb. 5, 2001).

BACKGROUND

LaBounty's allegations against the defendants are
fully described in the Court's November 25, 1996 Opinion,
familiarity with which is presumed. *LaBounty v.
Coombe, et al.,* No. 95 Civ. 2616, 1996 WL 684168
(S.D.N.Y. Nov. 25, 1996). Here, the Court only describes
those facts necessary for the purposes of this motion.[FN2]

FN2. To the extent that the plaintiff reiterates in
his opposition claims that have been previously
dismissed or makes new claims unrelated to the
issues which have been remanded, those claims
are not properly before this Court and the Court
does not consider them here.

By Order dated February 13, 2001, the Court
described the issues remanded by the Court of Appeals for
further development as follows:

1. The plaintiff's procedural due process claim that the
disciplinary hearing held on January 23 and 27, 1995
was delayed, that witnesses at that hearing were
examined outside his presence, and that Vuturo
prejudged the merits of the hearing.

2. Whether plaintiff's due process rights were violated
while he was in SHU during the period beginning on
January 27, 1995, by

(a) a denial of medication for his ear infection;

(b) the prescription of Flexeril for a back condition;

(c) Nurse Rivera substituting his back pain medication
with an unknown drug which caused him dizziness and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

head and stomach aches;

(d) a denial of paper and pencils;

(e) a denial of out-of-cell exercise;

(f) a denial of access to library books;

(g) not being permitted to mail letters in the evening; and

(h) the censorship or destruction of his mail, legal documents, and personal papers.

3. Whether, under *Sandin v. Conner,* 515 U.S. 472 (1995) and its progeny, the plaintiff has a liberty interest sufficient to bring the due process claims described in items 1 and 2.

The parties were ordered to inform the Court if they had any other understanding of the Court of Appeals' Order of remand.

By letter dated February 27, 2001, the defendants agreed that the February 13, 2001 Order correctly described the remanded issues. By letter dated February 17, 2001, the plaintiff also agreed with the description of the issues, but indicated a wish to add three additional issues. By Order dated February 28, 2001, the Court found that the issues remanded for further development were those described in the February 13, 2001 Order.

**\*2** The following facts are undisputed or as shown by the plaintiff unless otherwise noted. On January 12, 1995, LaBounty went to the clinic at Fishkill to renew his prescriptions for hypertension medication, and to complain of an ear infection. On that day, Nurse Ronald Waller issued an "Inmate Misbehavior Report" against him, which included the charge of refusing a direct order. Also on that day, Robert L. Macomber issued a "Inmate Misbehavior Report" against LaBounty, which included the charge of possessing outdated medications in his cell.

*Tier III Hearing*

On January 23 and 27, 1995, hearing officer Joseph

Vuturo ("Vuturo") conducted a "Tier III" disciplinary hearing to address the charges against plaintiff. [FN3] On January 27, Vuturo found LaBounty guilty of violating a direct order and possessing outdated medications. Vuturo sentenced LaBounty to 90 days of segregated confinement in the Special Housing Unit ("SHU"), of which 60 days were suspended. LaBounty served 30 days in SHU, beginning on January 27, 1995.

> FN3. Tier III hearings are held for " 'the most serious violations of institutional rules.' " *Colon v. Howard,* 215 F.2d 227, 230 n. 1 (2d Cir.2000) (citation omitted).

On January 27, 1995, LaBounty appealed his conviction to the Commissioner of the Department of Correctional Services ("DOCS"). On March 22, 1995, the DOCS Director of the Special Housing / Inmate Disciplinary Program, defendant Donald Selsky ("Selsky"), reversed LaBounty's conviction on the charge of possessing outdated medication because the "[m]isbehavior report fail[ed] to support [the] charge." On February 6, 1996, Selsky "administratively reversed" plaintiff's conviction on the only remaining charge-disobeying a direct order-"due to off-the-record communication used as evidence in hearing." Selsky directed that any records containing references to the January 27, 1995 hearing be expunged.

*SHU Conditions*

The SHU regulations provide that, while in SHU, inmates are confined to their cells for 23 hours a day, and are permitted to leave their cells for recreation, visits to the medical department, legal visits, guidance or counselor interviews, and for showers two times per week. SHU may be imposed for disciplinary and non-disciplinary, or administrative, reasons. Between January 1, 1991 and December 31, 1996, 162,601 of the 215,701 inmates in the New York correction system received "confinement sanctions." 106,265 inmates were penalized by "keeplock" confinement. In 1993, 4.2% of the inmates in DOCS' confinement were sentenced to SHU, and in 1994, 4.8% were sentenced to SHU.

*Plaintiff's Experience in SHU*

While in SHU, LaBounty was deprived of all of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

pain medication which had been prescribed for "constant severe pain related to his spinal condition," [FN4] as well as medication for an ear infection. LaBounty complained to defendant Nurse Rivera and to other medical staff that he was not receiving his pain medication and that he was suffering from an ear infection, but he received no response from them. On February 13, 1995, LaBounty was prescribed "Flexeril" by a physician's assistant, but LaBounty claims the medicine was merely prescribed as a "pretext" and that it did not help his severe pain or his ear infection. LaBounty was in "constant severe pain for the duration of his 30-days in SHU." LaBounty was not treated for his ear infection until he was released from SHU and given a CAT Scan. The CAT Scan revealed that the ear infection had become "Mastoiditis." As a result of the untreated ear infection, LaBounty lost the hearing in his right ear.

> FN4. Plaintiff asserts that his spinal condition was, at all relevant times, well-documented and diagnosed.

**\*3** While he was in SHU, LaBounty was prescribed one refill of his hypertension medication. A nurse gave the refill to officers, but the officers refused to give plaintiff his medication. After LaBounty repeatedly threw his bed against the cell door, the SHU evening supervisor came to his cell and later ordered the SHU officer to give LaBounty his medication.

While he was in SHU, LaBounty was deprived of any "out-of-the-cell exercise," which he requested each day. He was given only two showers during his 30 days in SHU, and each shower was only one to two minutes long. He requested a pen from the SHU officer in order to write his appeal to the Commissioner, and the officer refused. Plaintiff later received a pen from the "porter." [FN5] Plaintiff requested other writing materials from the officers, but they did not give him any. LaBounty received all of his writing materials from the porter and other inmates when they were let out for exercise. Before he was released from SHU, the officers opened LaBounty's "property bags" and "removed legal material relevant to this case and other pending cases." LaBounty was refused books and newspapers while he was in SHU despite requesting them.

> FN5. A porter is an inmate who is also serving a sentence in SHU.

DISCUSSION

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1987). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. See Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir.1994). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P. See also Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995). In deciding whether to grant summary judgment, this Court must, therefore, determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue.

Where, as here, a party is proceeding *pro se,* this Court has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994). Nonetheless, a *pro se* party's "bald assertion," completely unsupported by evidence, is insufficient to overcome a motion for summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991).

A. *Protected Liberty Interest*

**\*4** A claim for procedural due process violations requires a determination of "(1) whether the plaintiff had a protected liberty interest in not being confined and, if so,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

(2) whether the deprivation of that liberty interest occurred without due process of law." *Tellier v. Fields,*-F.3d-, 2001 WL 457767, at *7 (2d Cir. Nov. 1, 2000) (errata filed Apr. 26, 2001) (citation omitted). After the Supreme Court's decision in *Sandin v. Connor,* 515 U.S. 472 (1995), a determination that there is a liberty interest also requires a two-part analysis. *Tellier,*-F.3d-, 2001 WL 457767, at *7. " 'As a result of *Sandin,* a prisoner has a liberty interest only if the deprivation is atypical and significant and the state has created the liberty interest by statute or regulation." ' *Id.* (citation omitted).

*Atypical and Significant Hardship*

The defendants argue that LaBounty does not have a protected liberty interest because his confinement in SHU was not atypical or significant. To determine whether the conditions of a particular confinement impose an "atypical and significant hardship" one must undertake a factual analysis. *Id.* "The circumstances that the court must examine include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions....' " *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000) (citation omitted). It is clear that "[c]onfinement in SHU may impose hardships that are atypical or significantly different from the burdens of ordinary prison confinement." *Id.* " 'The content of the *Sandin* standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes and then apply the law of atypicality, as instructed by the Court." ' *Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (citation omitted).

Material issues of fact exist as to whether LaBounty's confinement in SHU was "atypical" as compared to the conditions of other inmates in both administrative confinement and in the general population. As noted above, LaBounty asserts that while he was in SHU, he was denied medication and medical treatment, writing materials, books, and exercise.[FN6] If proven true, these conditions would appear to be atypical when compared to the conditions of confinement not only of inmates in administrative confinement and in the general population, but also of other inmates in punitive segregation. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 304.1 *et seq.; Colon,* 215 F.3d at 230 (stating that "normal conditions of SHU confinement in New York" include one hour of exercise per day, two showers a week, and a limited number of books). LaBounty further asserts that the conditions in SHU caused him significant hardship in a number of ways, including severe physical pain and the loss of hearing.

FN6. Although not included in the list of issues from the February 13, 2001 Order, LaBounty also presents evidence that he was allowed only two showers in one month.

**\*5** The defendants rely on the length of LaBounty's sentence of confinement for their argument that his punishment was not atypical and significant. While it has been found in at least one other case that as much as 101 days in SHU did not run afoul of *Sandin, Sims,* 230 F.3d at 23, there is no litmus test based on the length of confinement alone-as the remand here demonstrates. *See also Colon,* 215 F.3d at 232 n. 5. Even a relatively brief term in segregated confinement may violate the law. *Taylor v. Rodriguez,* 238 F.3d 188, 196 (2d Cir.2001).

The defendants have also submitted evidence regarding the percentage of inmates in disciplinary confinement. These statistics do not address the specific conditions experienced by LaBounty during his confinement in SHU. *See Welch v. Bartlett,* 196 F.3d 389, 393-94 (2d Cir.1999) (vacating summary judgment where plaintiff alleged that SHU hygiene conditions were far inferior to those in general population). "[M]erely calculating the percentage of prisoners sentenced to SHU confinement" says nothing about the qualitative experience of prisoners in confinement and the relative degree to which they are deprived of the care and facilities at issue here. *Kalwasinski v. Morse,* 201 F.3d 103, 107 (2d Cir.1999).

The defendants make several additional arguments which can swiftly be rejected. They argue that only those deprivations experienced by LaBounty that independently constitute a constitutional violation-such as deliberate indifference to his serious medical needs in violation of the Eighth Amendment or an interference with his ability to pursue litigation in violation of the First Amendment-should be considered in judging whether LaBounty suffered atypical and significant hardships.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

There is no authority within either *Sandin* or its progeny in this Circuit for such a heightened showing. The defendants also argue that the issue of whether LaBounty suffered atypical and significant hardships should be tested not by his personal experience in SHU but by what the prison regulations prescribe as the standard for treatment of SHU prisoners. They contend, for instance, that what is relevant is that SHU prisoners are supposed to receive one hour per day of out of cell exercise and either two or three showers a week (depending on the level of prison) and not that LaBounty contends he received no opportunity to exercise and two brief showers in one month. The individualized inquiry required by the law is of the actual experience of the inmate, not what the experience should have been. *Sims,* 230 F.3d at 22-23. Finally, the defendants contend that they are entitled to summary judgment because while LaBounty's description of his deprivations is sufficient to create issues of fact regarding his own experience, he has not presented evidence that inmates in general population or in administrative confinement were not subjected routinely to those same deprivations. LaBounty has, until this point in the litigation, proceeded *pro se.* He was entitled to rely on the prison's regulations, well established law, and the basic standards of decency, to make the point that the deprivations of medical care, exercise, showers, books, and writing material that he alleges he experienced for one month cannot be the general experience of inmates incarcerated in New York state.

*Liberty Interest Created by State Law*

**\*6** The defendants argue that New York State has not granted inmates a protected liberty interest in remaining free from disciplinary confinement. In *Hewitt v. Helms,* 459 U.S. 460, 471-72 (1983), the Supreme Court held that a state-created "liberty interest arises when state statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates." *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999). *Sandin* did not replace *Hewitt*'s description of the process that creates a cognizable "liberty interest." *Tellier,*-F.3d-, 2001 WL 457767, at *7; *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999); *Welch,* 196 F.3d at 394 n. 4. Where a regulation requires "in language of an unmistakably mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates," *Tellier,*-F.3d-, 2001 WL 457767, at *8 (citation omitted), then the regulation creates a protectable liberty interest.

New York regulates the process through which SHU disciplinary confinement may be imposed. Regulations allow such confinement only upon "[d]isposition of superintendent's Tier III hearing for a designated period of time as specified by the hearing officer." N.Y. Comp.Codes R. & Regs. tit. 7, § 301.2 (McKinney 1999). The regulations further explain the manner in which the Tier III hearings must be conducted.

Upon receipt of a misbehavior report from the review officer, the hearing officer *shall* commence the superintendent's hearing as follows:

(a) The misbehavior report *shall* be served on the inmate at least 24 hours before the superintendent's hearing. If the inmate is confined and requests an assistant, the hearing *may not* start until 24 hours after the assistant's initial meeting with the inmate.

(b) The inmate *shall* be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals. The entire hearing *must* be electronically recorded.

(c) The inmate when present may reply orally to the charge and/or evidence and *shall* be allowed to submit relevant documentary evidence or written statements on his behalf.

N.Y. Comp.Codes R. & Regs. tit. 7, § 254.6 (McKinney 2000) (emphasis supplied). The regulations provide that "where the hearing officer affirms the charges on the basis of the evidence, the hearing officer may impose ... confinement to a cell or room continuously or to a special housing unit continuously or on certain days during certain hours for a specified period." *Id.* § 254.7.

It has long been recognized that New York's regulations authorizing restrictive confinement in SHU "provide sufficient limitation on the discretion of prison officials to create a liberty interest." *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984). *See also Sealey,* 197 F.3d at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

585 (construing New York regulation regarding administrative confinement in SHU). New York has therefore created a liberty interest protected by the Due Process Clause.

B. *Qualified Immunity*

**\*7** The defendants contend that they are entitled to qualified immunity. Qualified immunity protects a state actor sued in his individual capacity from a suit for damages. *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001). A state actor is qualifiedly immune if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Id.* (citation omitted).

LaBounty claims that he was deprived of his procedural due process rights during the 1995 disciplinary hearing because he was denied, among other things, the right to call witnesses and to introduce documentary evidence.[FN7] The law was clearly established in January 1995 that inmates have the right to call witnesses and submit documentary evidence at disciplinary hearings.[FN8] *Wolff v.. McDonnell,* 418 U.S. 539, 566 (1974); *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). Since the contours of LaBounty's due process rights were well defined by both Supreme Court and Second Circuit precedent by the time Vuturo conducted LaBounty's disciplinary hearing in January 1995, the defendants have not demonstrated that they are entitled to qualified immunity as a matter of summary judgment.

> **FN7.** The parties agreed in February 2001 that the procedural irregularities at issue here were the delay in the hearing, the examination of witnesses outside of LaBounty's presence, and a prejudgment of the merits by a hearing officer. The defendants do not object to LaBounty's emphasis in this motion on the interference with his right to offer evidence.

> **FN8.** The defendants characterize the pertinent inquiry as whether the law was clearly established in January 1995, that inmates have a liberty interest in remaining free from SHU confinement. Defendants argue that the Second

Circuit law since *Sandin* has been "ambiguous at best." The extent to which *Sandin* may have unsettled the law on this issue is irrelevant since *Sandin* was handed down after LaBounty's hearing. The law was "clearly established" as of January 1995, that inmates have a liberty interest in remaining free from segregated confinement such as SHU. *See, e.g., Walker v. Bates,* 23 F.3d 652, 655-56 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984).

C. *Personal Involvement*

Defendants contend that they are not liable for the alleged due process violations because none of the remaining defendants was personally involved in the January 1995 disciplinary hearing. The defendants argue that hearing officer Vuturo is the only proper defendant and that no action may proceed against him because he was never served in this case. As LaBounty will be appointed counsel in this case, counsel for all parties will be able to explore this issue further.[FN9]

> **FN9.** The defendants argue that LaBounty failed to exhaust his administrative remedies by not filing grievances regarding the conditions in SHU. Because the defendants raised this argument for the first time in their reply brief and it has not been developed, it will not be considered. *See Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 142 (2d Cir.1999) (holding that it would not consider arguments raised in a reply brief because "[w]e repeatedly have said that we will not consider contentions first advanced at such a late stage").

D. *Appointment of Counsel*

Plaintiff has submitted an application requesting counsel. In determining whether to grant a request for counsel, the Court must consider
the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

*Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir.1989). As a threshold matter, plaintiff must demonstrate that his claim has substance or a likelihood of success in order for the Court to grant plaintiff's request for counsel. *See Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986). Based on the Court's familiarity with this case and the legal issues presented, LaBounty's claim has substance and LaBounty has shown a need for representation. Accordingly, plaintiff's request for counsel is granted.

CONCLUSION

For the reasons stated, defendants' motion for summary judgment is denied. Plaintiff's request for counsel is granted. The Pro Se Office of this Court shall seek Pro Bono counsel for this plaintiff.

**8** SO ORDERED:

S.D.N.Y.,2001.

LaBounty v. Coombe
Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ramon ALVAREZ, Plaintiff,
v.
Thomas A. COUGHLIN, III, Commissioner NYS
DOCS; William Brunet, Seargent; SGT. Davis; SGT.
Emery; J. Baker, C.O.; W. Smith, C.O.; M. Hamilton,
C.O.; Mushen, C.O.; Supt. Barkley; Nurse L. Lipscum;
Thomas Farns, C.O.; Walter Lincoln, C.O., Defendants.
No. 94–CV–985(LEK)(DRH).

Feb. 6, 2001.
*MEMORANDUM–DECISION AND ORDER*

KAHN, J.

**\*1** Presently before the Court are Plaintiff's motions
for relief from judgment and for recusal of the
undersigned. For the reasons set forth below, Plaintiff's
motions are denied.

## I. BACKGROUND

Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services ("DOCS"),
commenced the present 42 U.S.C. § 1983 action alleging
violations of his Constitutional Rights on August 5, 1994.
On July 18, 1993, while Plaintiff was incarcerated at
Riverview Correctional Facility, defendant Baker alleges
that she witnessed Plaintiff exposing himself to her in the
recreation yard. Plaintiff was then taken from the yard
to the infirmary by defendants Baker, Smith, and Hamilton.
In his Amended Complaint, Defendant alleges, in relevant
part, that he was repeatedly assaulted by defendants
Davis, Smith, Mushen, and Hamilton while defendants
Liscum, Baker, and Emery stood by and watched in
violation of his Eighth Amendment rights. Plaintiff then
alleges that he was escorted to the prison's special housing
unit ("S.H.U.") and received further physical mistreatment
from defendants Emery, Mushen, Hamilton, Smith, Farns,
and Lincoln.

Plaintiff also alleges that his due process rights under

the Fourteenth Amendment were violated by the
disciplinary proceeding resulting from the incident, which
was conducted by defendant Brunet. Finally, Plaintiff
alleges that defendant Barkley participated in the violation
of these rights by failing to address Plaintiff's grievances
and by designating a biased hearing officer, defendant
Brunet, to preside over Plaintiff's Tier III hearing.

On June 14, 1999, defendants Brunet, Baker and
Barkley ("Defendants") filed a motion for summary
judgment pursuant to Fed.R.Civ.P. 56. Plaintiff filed an
affirmation in opposition to Defendants' motion on June
23, 1999 and a letter response on July 6, 1999. By an
Order dated October 25, 1999, this Court granted
Defendants' motion for summary judgment and dismissed
Plaintiff's case against them in its entirety.[FN1] Plaintiff's
current motions for relief from judgment and recusal were
filed on November 12, 1999 and March 23, 1999,
respectively.

> FN1. Also still pending before the Court is a
> motion for summary judgment filed by Plaintiff
> September 1, 1998. The motion was originally
> dismissed by the Court's Order adopting the
> Report–Recommendation of United States
> Magistrate Judge David R. Homer, which held
> that the motion was untimely and, in the
> alternative, that it failed on the merits. Then, by
> an Order dated June 1, 1999, the Court vacated
> its previous order and held that Plaintiff's motion
> would be addressed on the merits, along with
> Defendants' motion for summary judgment.
> However, Judge Homer's
> Report–Recommendation did address the merits
> of Plaintiff's motion. The Court has undertaken a
> de novo review of the record and has determined
> that Plaintiff's motion should be dismissed for the
> reasons discussed in the
> Report–Recommendation.

## II. ANALYSIS

A. Relief from Judgment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Plaintiff's motion, although termed a "motion for relief from judgment," is brought pursuant to Local Rule 7.1(g). Accordingly, it will be treated by the Court as a motion for reconsideration.

Motions for reconsideration proceed in the Northern District of New York under Local Rule 7.1(g), unless otherwise governed by *Fed.R.Civ.P. 60*. The "clearly erroneous" standard of review applies to motions for reconsideration. The moving party must "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995).

Generally, the prevailing rule in the Northern District "recognizes only three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice." *In re C–TC 9th Ave. P'ship,* 182 B.R. 1, 3 (N.D.N.Y.1995). Defendant does not argue that there has been an intervening change in controlling law or the availability of new evidence. Therefore, the basis for this motion must be that the Court made a clear error of law or needs to correct a manifest injustice. Although this Court enjoys broad discretion when making a determination to reconsider on this ground, *Von Ritter v. Heald,* 876 F.Supp. 18, 19 (N.D.N.Y.1995), it will not disregard the law of the prior case unless "the Court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981).

1. *Discovery Matters*

**\*2** Plaintiff, in part, objected to Defendants' motion for summary judgment on the ground that Defendants have yet to comply with several orders by this Court compelling production. Ordinarily, Defendants' failure to comply with discovery orders would make a motion for summary judgment premature. However, in this case, the outstanding items sought by Plaintiff do not relate to the claims against the three defendants who have brought the present action.

Plaintiff points to two orders compelling Defendants to comply with his discovery requests. The first, signed on June 26, 1997, orders Defendants to provide Plaintiff with: (1) the names, identification numbers, and cell locations of all inmates that were confined in the Special Housing Unit the evening of the event; (2) copies of any witness refusal forms; (3) copies of Plaintiff's medical records from July 18, 1993 to September 27, 1993; (4) copies of medical refusal forms indicating that Plaintiff refused his medication on the day of the incident; (5) copies of any reports prepared by prison staff regarding Plaintiff's refusal to take his medication between July 18, 1993 and September 27, 1993; and (6) copies of psychiatric reports regarding Plaintiff dated July 18, 1993 to September 27, 1993. The second order, signed on January 29, 1998, requires Defendants to provide Plaintiff with clearer copies of photographs taken of Plaintiff on the day of the incident.

To the extent any of these items exist, they are not relevant to the summary judgment motion before the Court. Accordingly, the Court is free to address the summary judgment motion of these three defendants. However, if Defendants still have not produced the complained of documents and photographs, Plaintiff is free to file another motion to compel or a motion for sanctions.

2. *Defendant Baker*

In their motion for summary judgment, Defendants argue that Plaintiff's claims against defendant Baker are conclusory and insufficient because they do not contain specific allegations of fact indicating a deprivation of rights. *See Barr v. Abrams,* 912 F.2d 52, 56 (2d Cir.1986). Plaintiff's Amended Complaint makes mention of defendant Baker only once. Plaintiff's first cause of action alleges that:

[t]he willful acts and omissions of defendant J. Baker constituted gross deprivation of the plaintiff's Civil Rights when J. Baker subject[ed] or caused plaintiff to be subjected to cruel and unusual punishment and failed to intervene to secure the plaintiff's health and safety.

However, Plaintiff's statement of facts does not allege that defendant Baker was present at the time of the beating

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

or that Baker had any knowledge whatsoever of the beating.

In fact, Plaintiff's statement of facts does not mention defendant Baker at all. The statement of facts does, on the other hand, describe with specificity the involvement of a number of prison staff members, including defendant Liscum who allegedly observed the assault without taking any action to intervene, suggesting that Baker was not present at the time of the beating. Accordingly, Plaintiff's claims against defendant Baker do not contain any specific allegations of fact regarding her alleged failure to intervene and this Court was not in error when it dismissed them.

### 3. *Defendant Barkley*

**\*3** Defendants argue that Plaintiff has not alleged sufficient personal involvement on the part of defendant Barkley. In order to maintain a Section 1983 action, a plaintiff must allege direct personal involvement by the defendant in the alleged constitutional deprivation. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (1994). Liability may not be based on respondeat superior or vicarious liability. *See Al– Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989).
Supervisors may be held liable for personal involvement when they: (1) are directly involved in the alleged events; (2) fail to rectify a constitutional violation after being notified of the situation; (3) create or allow to continue a policy of unconstitutional practices; or (4) commit gross negligence in supervising the individuals responsible for the constitutional violations. *See Wright,* 21 F.3d at 501.

Here, Plaintiff's complaint baldly alleges that defendant Barkley failed to address Plaintiff's grievance complaint and appointed a biased hearing officer to conduct Plaintiff's disciplinary hearing. Plaintiff does not make any specific factual allegations regarding defendant Barkley's involvement in his case. Plaintiff's statement of facts fails to allege facts establishing that Barkley ever reviewed his grievance. Indeed, Plaintiff's own exhibit reveals that Harlan W. Jarvis, Jr., Acting Superintendent, rather than defendant Barkley, reviewed Plaintiff's

grievance. Moreover, an exhibit introduced by Defendants, and not contradicted by Plaintiff, shows that Mr. Jarvis also appointed the hearing officer for Plaintiff's disciplinary hearing.

"It is not enough to allege that officials failed to carry out the duties of their office without defining these duties or how each individual failed to meet them." *Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at *5– *6 (S.D.N.Y. July 13, 1998) (citing *Beaman v. Coombe,* No. 96 Civ. 3622, 1997 WL 538833, at *3 (S.D.N.Y. Aug. 29, 1997), *aff'd in relevant part* No. 97–2683, 1998 WL 382751, at **1 (2d Cir. May 13, 1998)). Because Plaintiff's claim against defendant Barkley fails to allege with sufficient specificity his personal involvement in the alleged constitutional violations, it was properly dismissed by the Court.

### 4. *Defendant Brunet*

Plaintiff alleges that defendant Brunet violated his Due Process rights under the Fourteenth Amendment in the conduct of his disciplinary hearing. Defendants argue that (1) Plaintiff's claim is barred by the Supreme Court decision in *Sandin v. Conner,* 515 U.S. 472 (1995), because Plaintiff has not alleged that he had a protected liberty interest; (2) Plaintiff was nevertheless accorded all of the process due under *Wolff v. McDowell,* 418 U.S. 539 (1974); and (3) defendant Brunet is protected by qualified immunity in any event.[FN2] In order to establish a due process violation, a defendant must "prove that the state has created a protected liberty interest and that the process due was denied." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)).

> FN2. Defendants also argue in their brief that Plaintiff's claim is barred by the Supreme Court decisions in *Heck v. Humphrey,* 512 U.S. 477 (1994), and *Edwards v. Balisok,* 520 U.S. 641 (1997). Following the filing of Defendants' brief, however, the Second Circuit held that a Section 1983 suit "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *Heck* and *Edwards.*" *Jenkins v. Haubert,* 179 F.3d 19, 27

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

(2d Cir.1999). Because Plaintiff's complaint challenges the conditions of, as opposed to the fact or duration of his confinement, the *Heck* and *Edwards* decisions are not applicable.

a. *Protected liberty interest*

**\*4** In *Sandin,* the Supreme Court considered whether prisoners have a protected liberty interest entitling them to due process in disciplinary proceedings and held that such interests "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prisoner life." *Sandin,* 515 U.S. at 483–84. Following the *Sandin* decision, the Second Circuit held that, in order for a liberty interest to be protectable, a plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin,* and that the state has granted inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

i. Atypical and significant hardship

The Second Circuit has repeatedly held that, in determining whether a liberty interest has been affected, a district court is required to undertake extensive fact-finding regarding both the length and conditions of confinement and make specific findings in support of its conclusions. *See, e.g., Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997); *Sealey v. Giltner,* 116 F.3d 47, 51–52 (2d Cir.1997); *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). The Second Circuit makes clear that it is not enough to look at the length of time a prisoner has been confined to SHU in determining whether he has a liberty interest. *Brooks,* 112 F.3d at 49. Instead, courts must also make a factual finding as to the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population. *Id.* (citing *Miller,* 111 F.3d at 8–9).

However, in *Hynes v. Squillance,* 143 F.3d 653 (2d Cir.1998), the Second Circuit held that, "in cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, the district court need not provide such detailed explanation

of its reasoning." *Id.* at 658. There, the plaintiff offered no evidence in support of his argument that his 21–day confinement was atypical or significant to contradict the defendants' submission showing that the conditions of confinement were typical. *See id.* The ruling was explicitly limited, however, to cases involving shorter periods of segregated confinement. *See id.* The Court held that the decisions in *Miller, Brooks,* and *Wright* all required specific factual findings because they "involved relatively long periods of confinement." *Id.; see also Spaight v. Cichon,* No. 98–2537, 1998 WL 852553, at *2 (2d Cir. Dec 8, 1998) (holding that a 39–day confinement was not so short as to be subject to dismissal under *Hynes* without further analysis); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (advising district courts to develop a detailed factual record for cases involving segregated confinement of between 101 and 305 days in lenght). The plaintiff in *Miller,* for example, was subject to disciplinary segregation for 125 days. *See Miller,* 11 F.3d at 7.

**\*5** In this case, Plaintiff was subject to 120 days in disciplinary segregation, much closer to the period of confinement in *Miller* than that in *Hynes.* Accordingly, the Court may not rely on the length of Plaintiff's confinement alone and must undertake a detailed factual finding regarding the conditions of Plaintiff's confinement as compared to other forms of segregated confinement and to the general population of inmates.

To establish that Plaintiff's confinement was not atypical and significant, Defendants put forth the affidavit of Mr. Donald Selsky, Director of the Special Housing/Inmate Disciplinary Program. However, Selsky's affidavit discusses the special housing program on a statewide basis in comparison to general population policies statewide, but acknowledges that conditions differ from facility to facility. The affidavit also includes a variety of statistics regarding SHU confinement establish, including the fact that 19,983 of the 215,701 inmates (9.26%) in the prison system between 1991 and 1996 were penalized with SHU confinement and that 17,302 of those received terms up to one year (85.17%). It does not, however, provide any evidence regarding the specific conditions of Plaintiff's confinement.

This leaves the Court with insufficient evidence with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

which to compare Plaintiff's conditions of confinement to other forms of segregated confinement and to the general population. If such a generalized showing by the government regarding the typicality of segregated confinement was satisfactory, then there would be no need for the specific factual findings required in each case by the Second Circuit.

Indeed, in *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1994), the Second Circuit held that a district court's reliance on the percentage of the prison population receiving punitive terms of segregated confinement and the percentage of that group receiving terms similar in length to that of the plaintiff was inappropriate. *See id.* at 394. The Court held that

> [t]he theory of *Sandin* is that, notwithstanding a mandatory entitlement, a deprivation is not of sufficient gravity to support a claim of violation of the Due Process Clause if similar deprivations are typically endured by other prisoners, not as a penalty for misbehavior, but simply as the result of ordinary prison administration.

> *Id.*

A comparison between the duration of a plaintiff's SHU confinement and the SHU terms received by other inmates who were convicted of misbehavior "does not tell whether [the plaintiff's] deprivation was more serious than typically endured by prisoners as an ordinary incident of prison life." *Id.* Likewise, the court held that punitive terms in SHU

> are not a 'normal incident' for a prisoner whose wrongdoing must be established according to due process standards if the consequence of an adverse finding is confinement in atypical conditions of severe hardship. How many prisoners receive such terms as punishment for misbehavior does not measure how likely a prisoner is to suffer comparable deprivation in the ordinary administration of the prison.

**\*6** *Id.* Moreover, the Court expressed doubt that, even if such a statistic was held to be relevant, the fact that 10% of prisoner were subject to terms in SHU made such

confinement typical. *See id.* at 394 n.2.

As the record before the Court is not sufficient to determine whether Plaintiff's confinement was an atypical and significant hardship, summary judgment at this time is inappropriate.

### ii. State created liberty interest

Defendants also argue the second prong of the *Frazier* test, requiring Plaintiff to establish the existence of a state-created liberty interest in remaining free from segregated confinement, has not been satisfied. Defendants contend that no New York law grants prisoners the right to be free from segregated confinement.

Defendants argue that previous Second Circuit precedent establishing the existence of such a state-created interest, *see, e.g., Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984), does not survive the Supreme Court's decision in *Sandin.* However, *Sandin* does not effect the validity of these decisions. *See Ramirez v. McGinnis,* 75 F.Supp.2d 147, 153 (S.D.N.Y.1999) (holding that *Sandin* "simply limits due process protection to hardships that are also 'atypical and significant' ") (citing *Gonzalez v. Coughlin,* 969 F.Supp. 256, 257 (S.D.N.Y.1997); *Wright v. Miller,* 973 F.Supp. 390, 395 (S.D.N.Y.1997); *Lee v. Coughlin,* 26 F.Supp.2d 615, 632–33 (S.D.N.Y.1998)). Accordingly, New York State regulations do create a protected liberty interest in remaining free from disciplinary segregation.

### b. *Process Due*

Defendants next urge the Court to find that, even if Plaintiff was entitled to due process protections, he was afforded the necessary procedural protections at his hearing. In a conclusory fashion, Defendants argue that Plaintiff "received advance notice of the charges, called witnesses at the hearing, and testified on his own behalf."

When charged with a disciplinary infraction that could lead to loss of good-time credits or to confinement in SHU, a prisoner is entitled to "at least the minimum requirements of procedural due process appropriate for the circumstances." *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974); *see Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983)). This requires, among things, that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

prisoner be given advance notice of the charges against him and a meaningful opportunity to marshall and present evidence in his defense, which includes the right to "call witnesses and present evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 563, 566.

Plaintiff specifically argues that defendant Brunet denied him due process by, among other things, disregarding his complaints regarding the confiscation of his trial materials and refusing to allow him to present an eye witness who would testify that Plaintiff was beaten by several of the defendants. The requirement that a prisoner be given advance notice of the charges against him is "no mere formality." *Benitez,* 985 F.2d at 665. Such "notice must be 'written ... in order to inform [the inmate] of the charges and to enable him to marshall the facts and prepare a defense.' " *Id.* (quoting *Wolff,* 418 U.S. at 564). Moreover, the prisoner must be given the notice no less than 24 hours before the hearing and be permitted to retain the notice for at least 24 hours. *See Benitez,* 985 F.2d at 665–66.

**\*7** Here, Plaintiff alleges that his litigation papers were all confiscated from him by the guards in the SHU and that, when he complained of these actions to defendant Brunet, his concerns were ignored. Confiscation of a prisoner's papers made in preparation for a hearing, particularly the notice of charges, significantly hampers the prisoner's ability to prepare his defense. Defendants do not address Plaintiff's allegation in their papers. Accordingly, summary judgment is not appropriate on this ground.

A prisoner is also given the right to call and present witnesses in his defense at a disciplinary hearing. *See Ponte v. Real,* 471 U.S. 491, 495 (1985) (citing *Wolff,* 418 U.S. at 566)). This right is not absolute, however, as prison officials must be allowed "discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority." *Wolff,* 418 U.S. at 566; *see also Ponte,* 471 U.S. at 496 (suggesting that prison officials may also deny a witness request on grounds of irrelevance or lack of necessity). However, "a hearing official has a duty to

articulate an explanation for the decision to exclude a witness." *Rivera v. Coughlin,* No. 92 Civ. 3404, 1994 WL 263417, at \*6 (S.D.N.Y. June 13, 1994).

In this case, Plaintiff alleges that he requested the presence of an eye-witness to the events in question but that defendant Brunet did not allow it. The transcript to the hearing reveals that Brunet informed Plaintiff that he could not contact the witness because he could not contact the witness and the hearing had to be finished that day.

Defendants have not argued, much less established, that these were reasonable limits placed on the hearing by Brunet. Moreover, Defendants have not presented any evidence or argued that allowing the witness' testimony would have been "unduly hazardous to institutional safety" or create a "risk of reprisal or undermine authority." Defendants do not even argue the validity or importance of those reasons set forth by defendant Brunet at the hearing. Finally, it is clear that the proposed evidence in this case was not irrelevant or unnecessary. Accordingly, genuine issues of material fact exist which prevent a finding of summary judgment at this time.

c. *Qualified Immunity*

Finally, relying solely on their prior arguments, Defendants contend that defendant Brunet is protected by qualified immunity. The doctrine of qualified immunity protects a Section 1983 defendant from liability for damages if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Defendants are further protected from liability where the rights are clearly established if it was objectively reasonable to believe that their actions did not violate those rights. *See Anderson v. Creighton,* 483 U.S. 635, 638 (1987).

**\*8** The officials do not have such immunity, however, where the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. In determining whether a particular right was clearly established at the time of the alleged violation, courts should consider:

(1) whether the right in question was defined with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

"reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

In this case, Plaintiff's right to notice and to present witnesses were clearly established and well defined at the time of the hearing, July 22, 1993. Although, prior to 1993, it was not entirely clear whether a prisoner was entitled to keep his notice for at least 24 hours, *Benitez* clarified that this was so on February 3, 1993. Therefore, it was not objectively reasonable for defendant Brunet to leave unanswered Plaintiff's complaint that his litigation papers were confiscated.

Also, the right to present witnesses at a disciplinary hearing and the limitations on that right were well defined prior to the time of the hearing. Whether the rationale offered by defendant Brunet for excluding the witness, the difficulty in locating the witness and the need to complete the hearing that day, are sufficient justification to support his qualified immunity defense are material issues of fact which cannot be resolved on a motion for summary judgment. *See Rivera,* 1994 WL 263417, at *6. Accordingly, summary judgment may not be granted on this ground.

In light of these holdings, it is evident that this Court made a clear error of law and that reconsideration is appropriate as to Plaintiff's claims against defendant Brunet.

B. Recusal

Plaintiff's motion for recusal is based on 28 U.S.C. § 455(a), which states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Id.* Importantly, it does not matter whether the judge is in fact subjectively impartial, only whether the objective facts create the appearance of impartiality. *United States v. Bayless,* 201 F.3d 116, 126 (2d Cir.2000);

*Hughes v. City of Albany,* No. 98–2665, 1999 WL 709290, at **2 (2d Cir. July 1, 1999). "The ultimate inquiry is whether 'a reasonable person, knowing all the facts, would conclude that the trial judge's impartiality could reasonably be questioned." ' *Hughes v. City of Albany,* 33 F.Supp.2d 152, 153 (N.D.N.Y.1999) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)); *see Bayless,* 201 F.3d at 126.

In this case, Plaintiff's claim is based on the congregation of a number of the Court's rulings and the overall handling of his case. The Supreme Court has held, however, that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555 (1994); *see Hughes,* 1999 WL 709290, at **2. Indeed, the Second Circuit has held that "opinions formed by a judge on the basis of facts introduced or events occurring in the course of judicial proceedings do not constitute a basis for recusal unless they indicate that the judge has a 'deep-seated favoritism or antagonism that would make fair judgment impossible." ' *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir.1999) (quoting *Liteky,* 510 U.S. at 555). Plaintiff has put forth nothing, and a review of the record reveals nothing, which would suggest to an objective observer that the Court has a deep-seated favoritism for Defendants or any antagonism against Plaintiff. Therefore, his motion is denied.

III. CONCLUSION

*9 ORDERED that Plaintiff's motion to vacate is GRANTED in part and DENIED in part consistent with the terms of this opinion;

ORDERED that Plaintiff's claim against defendant Brunet be REINSTATED and the judgment dismissing the case in defendant Brunet's favor be VACATED;

ORDERED that Plaintiff's motion for recusal is DENIED; and it is further

ORDERED that the clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

N.D.N.Y.,2001.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Alvarez v. Coughlin
Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Spence v. Senkowski, Not Reported in F.Supp. (1998)

1998 WL 214719

1998 WL 214719
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kirjath SPENCE, Plaintiff,
v.
Daniel A. SENKOWSKI, Superintendent,
W.J. Wilkerson, Captain, Defendants.

No. 91–CV–955 (NPM).
|
April 17, 1998.

**Attorneys and Law Firms**

Kirjath Spence, Brooklyn, for Plaintiff, Pro Se.

Office of John F. Laidlaw, Pro Bono Standby Trial
Attorney for Plaintiff, Syracuse, John F. Laidlaw, Esq.

Honorable Dennis C. Vacco, Attorney General of the
State of New York, Attorney for Defendants, Albany,
Christopher W. Hall, Assistant Attorney General, of
Counsel.

MEMORANDUM–DECISION & ORDER

MCCURN, S. J.

I. BACKGROUND

**\*1** In this prisoner civil rights action, plaintiff Kirjath
Spence alleges his Fourteenth Amendment due process
rights were violated as the result of a disciplinary
hearing held at Clinton Correctional Facility ("Clinton").
Subsequent to the hearing, plaintiff was sentenced to 180
days confinement in the Special Housing Unit ("SHU"),
180 days recommended loss of good time, and 180 days
loss of privileges. Plaintiff appealed his sentence and the
hearing results were reversed, but not before plaintiff
served his 180 days in SHU.

Plaintiff subsequently filed this action pursuant to 42
U.S.C. § 1983. In August 1992, defendants moved for
summary judgment pursuant to Federal Rule of Civil
Procedure 56. The court granted defendants' motion for
summary judgment on the issue of the denial of a witness
at the hearing and on the issue of damages incurred

by reason of punishment prior to the administrative
reversal. See *Spence v. Senkowski,* No. 91–CV–955, 1993
WL 191163 (N.D.N.Y. June 3, 1993). The court denied
the defendants' motion for summary judgment regarding
the claim of a biased hearing officer and regarding the
claim that then superintendent of Clinton, defendant
Senkowski, was personally involved in the selection of the
allegedly biased hearing officer. *See id.*

In August 1995, defendants moved to dismiss the action
for failure to state a claim upon which relief can be granted
pursuant to Federal Rule of Civil Procedure 12(b)(6).
In July 1997, the court denied defendants' motion. *See
Spence v. Senkowski,* No. 91–CV–955, 1997 WL 394667
(N.D.N.Y. July 3, 1997). In November 1997, the court
conducted a bench trial on the remaining issues—*i.e.,*
whether plaintiff was entitled to procedural due process
under the Fourteenth Amendment, whether the hearing
officer, defendant W.J. Wilkerson ("Wilkerson"), was
impartial, and whether defendant Senkowski had any
personal involvement in selecting Wilkerson as the hearing
officer.

At the conclusion of trial, defendants moved for judgment
on their behalf. The court granted the motion on behalf
of defendant Senkowski on the ground that there was no
evidence of his personal involvement. The court reserved
on the motion with respect to defendant Wilkerson.

For the reasons set forth, the court now finds in favor of
defendant Wilkerson and dismisses plaintiff's complaint.
The following constitutes the court's findings of fact and
conclusions of law pursuant to Rule 52(a) of the Federal
Rules of Civil Procedure.

II. FACTS

On May 19, 1990 a fight in the auditorium at Clinton
created a disturbance that escalated to a near-riot.
Transcript of Trial Proceedings ("Tr.") at 9. The
atmosphere in the auditorium was "very tense" and
additional fights erupted in the auditorium. *Id* . The prison
was "locked down" while prison authorities attempted to
maintain order. Tr. at 9–10.

Near the end of the disturbance, then-Captain Wilkerson,
the highest ranking officer at Clinton on May 19, 1990,
was notified of the incident via a distress call. Tr. at 38.

Spence v. Senkowski, Not Reported in F.Supp. (1998)

1998 WL 214719

Wilkerson was advised that while the matter was quelled and the disruptive inmates removed from the scene, the other inmates refused to leave the auditorium. Tr. at 38–39. Wilkerson then proceeded to the auditorium and upon arrival, advised the inmates that if they wanted to leave peacefully they could line up in the center of the auditorium and leave without repercussions. Tr. at 9, 40. Plaintiff was one of the first inmates to leave the auditorium. Tr. at 9. Within 15 minutes, after being satisfied that the disturbance in the auditorium was under control, Wilkerson left the auditorium and returned to his office. Tr. at 40–41.

**\*2** During the disturbance in the auditorium, a corrections officer—Officer Bishop—was assaulted by an inmate. Tr. at 10. On May 21, 1990, plaintiff was identified and accused by Officer Bishop as the individual who assaulted him in the auditorium on May 19, 1990 during the disturbance. Tr. at 10. The next day, plaintiff was taken to SHU and served with a misbehavior report accusing him of assaulting officer Bishop. Tr. at 11.

On May 23, 1990 a Tier III hearing was commenced by Wilkerson in connection with the misbehavior report that Officer Bishop had filed. Tr. at 11, 42. At the conclusion of the hearing, Wilkerson concluded that plaintiff was guilty as charged and provided plaintiff with the reasons for his decision. Tr. at 43–44; Defendants' Trial Exhibit "8" (Hearing Disposition Form). Plaintiff was sentenced to 180 days confinement in SHU, 180 days recommended loss of good time, and 180 days loss of privileges—which included loss of packages and loss of commissary. Tr. at 15–16. In addition, plaintiff testified that while in SHU he could not "communicate" with his father who was seriously ill, although he was subsequently escorted to his father's funeral by prison officials. [1] Tr. at 15–16.

Plaintiff administratively appealed as well as filed an Article 78 proceeding in state court and the hearing results were reversed based upon the fact that plaintiff was denied a requested witness, but not before plaintiff served his 180 days in SHU. Tr. at 16. Based upon these events, plaintiff commenced this lawsuit.

## III. DISCUSSION

In this § 1983 action, plaintiff asserts that his Fourteenth Amendment due process rights were violated by defendant

Wilkerson because Wilkerson was not an impartial hearing officer. Plaintiff asserts that Wilkerson was not impartial because he witnessed and investigated the May 19, 1990 incident in the Clinton auditorium. The court, however, need not decide the issue of whether Wilkerson was impartial because it concludes that plaintiff was not entitled to the due process protection of the Fourteenth Amendment. Furthermore, even assuming plaintiff was entitled to due process protection, the court concludes that Wilkerson is immune from liability under the doctrine of qualified immunity.

The Fourteenth Amendment prohibits an individual from being deprived of constitutionally protected liberty interests without due process. See *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Constitutionally protected liberty interests of a prison inmate are limited to freedom from restraints which impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 115 S.Ct. 2293, 2300 (1995). The Constitution "does not protect [inmates from] every change in the conditions of confinement having a substantial adverse impact on the prisoner" if those changes are "within the normal limits or range of custody which the conviction has authorized the State to impose." *Id.* at 478, 115 S.Ct. at 2297 (internal quotations and citations omitted). Rather, the "Due Process Clause protects against restraint or conditions of confinement that 'exceed[ ] the sentence in ... an unexpected manner.' " *Arce v. Walker,*—F.3d—, 96–2012, 1998 WL 119612 (2d Cir. Mar.18, 1998). The Supreme Court has instructed that federal courts should "afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Sandin,* 515 U.S. at 482, 115 S.Ct. at 2299.

**\*3** After examining the specific circumstances of plaintiff's confinement during his time in SHU, the court concludes that plaintiff did not have a constitutional liberty interest which was interfered with when he was disciplinarily confined in SHU for 180 days. Other than the length of time plaintiff was confined to SHU, plaintiff has offered little evidence to demonstrate that his punishment was of such a nature as to confer a constitutionally protected liberty interest. As the case law demonstrates, it is clear that plaintiff's confinement in SHU for 180 days was not an atypical or significant hardship, especially when compared to his sentence of six to twelve years. See *Sealy v. Coughlin,*—F. Supp.

Spence v. Senkowski, Not Reported in F.Supp. (1998)

1998 WL 214719

—, No. 92–CV–47, 1998 WL 113383 (N.D.N.Y. Mar.13, 1998) (152 days in SHU is not an atypical or significant hardship); *Horne v. Coughlin,* 949 F.Supp. 112, 117 (180 days in SHU does not implicate due process protection); *Carter v. Carriero,* 905 F.Supp. 99, 104 (W.D.N.Y.1995) (270 days in SHU not considered an atypical or significant hardship); *Husbands v. McClellan,* No. 93–CV–6025L, 1998 WL 24232, at *2 (W.D.N.Y. Jan.13, 1998) (180 days in SHU not an atypical or significant hardship); *Ruiz v. Selsky,* No. 96 Civ.2003, 1997 WL 137448, at *6 (S.D.N.Y. March 24, 1997) (192 days in SHU not a significant and atypical hardship); *Nogueras v. Coughlin,* No. 94 Civ. 4094, 1996 WL 487951, at *5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU does not trigger due process concerns).

Moreover, plaintiff's testimony regarding his loss of privileges the conditions of his confinement is insufficient to elevate his claim to constitutional proportions. *See, e.g., Sealey,*—F. Supp at—, 1998 WL 113383 at *5 ("the denial of certain privileges enjoyed by inmates placed in general population fails to identify conditions outside the expected parameters of the sentence imposed by law." (citing *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)). Plaintiff testified, for instance, that he was deprived of packages, telephone privileges, commissary privileges, and his prison job. Furthermore, he stated that when he was transported anywhere in the facility, he was required to be placed in handcuffs and shackles. While these conditions of confinement are "more restrictive than those in general population," they are insufficient to implicate a liberty interest, even when coupled with the 180 days plaintiff was confined to SHU. *See Arce,* 1998 WL 119612 at * 3–4 (a prison inmate is required to show that his confinement created an atypical and significant hardship to establish the existence of a liberty interest); *Jones v. Kelly,* 937 F.Supp. 200, 203 (W.D.N.Y.1996) (court found that loss of privileges such as telephone was insufficient for finding that plaintiff's confinement was atypical). [2] Accordingly, the court concludes that plaintiff is not entitled to the protections of the Fourteenth Amendment and therefore his § 1983 action must fail.

**\*4** In the alternative, even if the court assumed that plaintiff's confinement to SHU represented grievous losses of liberty entitling him to due process protections—which the court declines to find—the evidence presented at trial demonstrated that defendant Wilkerson would be entitled to qualified immunity. Qualified immunity protects prison

officials from personal liability under § 1983 when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). These officials' action are to be assessed in light of the legal rules that were clearly established at the time the actions are taken. *E.g., Anderson v. Creighton,* 483 U.S. 635, 638–40, 107 S.Ct. 3034, 3037–38, 97 L.Ed.2d 523 (1987). Moreover, public officials may be afforded the protection of qualified immunity "even if the contours of the plaintiff's federal rights and the public officials' permissible actions were clearly delineated at the time of the actions complained of, if it was objectively reasonable for the officials to believe that their actions did not violate those rights." *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993).

Plaintiff asserts that his constitutional right to due process was violated because he did not have a hearing before an impartial hearing officer. In this regard, plaintiff contends that New York prison regulations prohibit persons who either witness the incident or investigate the incident from acting as hearing officers in a subsequent hearing concerning that incident. *See* N.Y.C.R.R. tit. 7, § 254.1. Plaintiff contends that inasmuch as Wilkerson was present at the scene he witnessed and investigated the incident and then acted as a hearing officer in violation of the section 254.1. The evidence, however, revealed that Wilkerson did not witness nor investigate the specific incident involving plaintiff (*i.e.,* the alleged assault on Officer Bishop). Wilkerson merely arrived at the auditorium as the facility's acting superintendent to ensure that order was restored and maintained in a potentially explosive situation. Tr. at 39–41.

On direct examination during trial, Wilkerson testified that he only stayed in the auditorium long enough to observe the inmates begin to be escorted out of the auditorium. Tr. at 40. Further, Wilkerson testified that he was not directly involved in the alleged incident involving plaintiff, that he did not witness Officer Bishop—or any other prison officer—being assaulted, that he only learned at a later time that an officer was assaulted, and that he did not review the plaintiff's misbehavior report. Tr. at 41–42; *cf. Hameed v. Mann,* 849 F.Supp. 169, 173 (N.D.N.Y.1994) (court found that hearing officer's impartiality was not compromised by pre-hearing briefing by superintendent that everyone on B–2 was involved in the incident). Wilkerson also testified that he had no

Spence v. Senkowski, Not Reported in F.Supp. (1998)

1998 WL 214719

predisposition as to whether plaintiff was guilty prior to the hearing. Tr. at 47. Significantly, Wilkerson testified that there was nothing about the fact that he was present at the scene of the incident which entered into his deliberations at the time of plaintiff's hearing and that he did not consider himself flawed as a hearing officer because he did not possess information prior to the hearing to form an opinion as to plaintiff's guilt or innocence. Tr. at 83, 85.

**\*5** Based upon the testimony adduced at trial, the court concludes that it was objectively reasonable for Wilkerson to believe that he was not violating plaintiff's clearly established constitutional rights to an unbiased hearing officer. *See Walker v. McClellan,* 126 F.3d 127, 128–30 (2d Cir.1997) (hearing officer entitled to qualified immunity because "the hearing officer was well-justified in the belief that his ruling was consistent with [plaintiff's] constitutional rights."); *Russell v. Selsky,* 35 F.3d 55, 61 (2d Cir.1994) (in holding hearing officer entitled to qualified immunity, court set forth that "a reasonable

officer would not have recognized a denial of due process in his serving as hearing officer in a case in which he had previously served as review officer."). Accordingly, the court concludes that had plaintiff been entitled to due process protection, defendant Wilkerson would be immune from liability under the doctrine of qualified immunity.

### III. CONCLUSION

For the foregoing reasons, judgment shall be entered on behalf of defendant Wilkerson and plaintiff's complaint is hereby DISMISSED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1998 WL 214719

---

Footnotes

1    During trial, plaintiff testified that he was denied telephone privileges during his confinement to SHU. Tr. at 15. Wilkerson testified that SHU inmates can send and receive regular mail and legal correspondence. Tr. at 59.

2    During the presentation of his case, plaintiff highlighted the distinction between administrative confinement in SHU and disciplinary confinement in SHU. After reviewing this evidence, the court concludes that the administrative confinement closely resembled the disciplinary confinement in SHU at Clinton. *See* Tr. at 56 (Wilkerson testified that an inmate in SHU for administrative reasons is generally treated the same as an inmate in SHU for disciplinary reasons); *see also Jones,* 937 F.Supp. at 203 ("[d]isciplinary segregation in New York mirrors, with insignificant exceptions, the conditions of administrative segregation and protective custody." (citations omitted)). Moreover, while a "comparison between administrative and disciplinary confinement was part of the Court's analysis in *Sandin,*" the significant analysis focused on a "careful examination of the actual conditions of the challenged punishment compared with ordinary prison conditions." *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997).

---

**End of Document**                                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Spence v. Senkowski, Not Reported in F.Supp. (1998)

1998 WL 214719

1998 WL 214719
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kirjath SPENCE, Plaintiff,
v.
Daniel A. SENKOWSKI, Superintendent,
W.J. Wilkerson, Captain, Defendants.

No. 91–CV–955 (NPM).
|
April 17, 1998.

**Attorneys and Law Firms**

Kirjath Spence, Brooklyn, for Plaintiff, Pro Se.

Office of John F. Laidlaw, Pro Bono Standby Trial Attorney for Plaintiff, Syracuse, John F. Laidlaw, Esq.

Honorable Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, Christopher W. Hall, Assistant Attorney General, of Counsel.

MEMORANDUM–DECISION & ORDER

MCCURN, S. J.

I. BACKGROUND

**\*1** In this prisoner civil rights action, plaintiff Kirjath Spence alleges his Fourteenth Amendment due process rights were violated as the result of a disciplinary hearing held at Clinton Correctional Facility ("Clinton"). Subsequent to the hearing, plaintiff was sentenced to 180 days confinement in the Special Housing Unit ("SHU"), 180 days recommended loss of good time, and 180 days loss of privileges. Plaintiff appealed his sentence and the hearing results were reversed, but not before plaintiff served his 180 days in SHU.

Plaintiff subsequently filed this action pursuant to 42 U.S.C. § 1983. In August 1992, defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The court granted defendants' motion for summary judgment on the issue of the denial of a witness at the hearing and on the issue of damages incurred

by reason of punishment prior to the administrative reversal. See *Spence v. Senkowski,* No. 91–CV–955, 1993 WL 191163 (N.D.N.Y. June 3, 1993). The court denied the defendants' motion for summary judgment regarding the claim of a biased hearing officer and regarding the claim that then superintendent of Clinton, defendant Senkowski, was personally involved in the selection of the allegedly biased hearing officer. *See id.*

In August 1995, defendants moved to dismiss the action for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). In July 1997, the court denied defendants' motion. *See Spence v. Senkowski,* No. 91–CV–955, 1997 WL 394667 (N.D.N.Y. July 3, 1997). In November 1997, the court conducted a bench trial on the remaining issues—*i.e.,* whether plaintiff was entitled to procedural due process under the Fourteenth Amendment, whether the hearing officer, defendant W.J. Wilkerson ("Wilkerson"), was impartial, and whether defendant Senkowski had any personal involvement in selecting Wilkerson as the hearing officer.

At the conclusion of trial, defendants moved for judgment on their behalf. The court granted the motion on behalf of defendant Senkowski on the ground that there was no evidence of his personal involvement. The court reserved on the motion with respect to defendant Wilkerson.

For the reasons set forth, the court now finds in favor of defendant Wilkerson and dismisses plaintiff's complaint. The following constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

II. FACTS

On May 19, 1990 a fight in the auditorium at Clinton created a disturbance that escalated to a near-riot. Transcript of Trial Proceedings ("Tr.") at 9. The atmosphere in the auditorium was "very tense" and additional fights erupted in the auditorium. *Id .* The prison was "locked down" while prison authorities attempted to maintain order. Tr. at 9–10.

Near the end of the disturbance, then-Captain Wilkerson, the highest ranking officer at Clinton on May 19, 1990, was notified of the incident via a distress call. Tr. at 38.

Spence v. Senkowski, Not Reported in F.Supp. (1998)

1998 WL 214719

Wilkerson was advised that while the matter was quelled and the disruptive inmates removed from the scene, the other inmates refused to leave the auditorium. Tr. at 38–39. Wilkerson then proceeded to the auditorium and upon arrival, advised the inmates that if they wanted to leave peacefully they could line up in the center of the auditorium and leave without repercussions. Tr. at 9, 40. Plaintiff was one of the first inmates to leave the auditorium. Tr. at 9. Within 15 minutes, after being satisfied that the disturbance in the auditorium was under control, Wilkerson left the auditorium and returned to his office. Tr. at 40–41.

**\*2** During the disturbance in the auditorium, a corrections officer—Officer Bishop—was assaulted by an inmate. Tr. at 10. On May 21, 1990, plaintiff was identified and accused by Officer Bishop as the individual who assaulted him in the auditorium on May 19, 1990 during the disturbance. Tr. at 10. The next day, plaintiff was taken to SHU and served with a misbehavior report accusing him of assaulting officer Bishop. Tr. at 11.

On May 23, 1990 a Tier III hearing was commenced by Wilkerson in connection with the misbehavior report that Officer Bishop had filed. Tr. at 11, 42. At the conclusion of the hearing, Wilkerson concluded that plaintiff was guilty as charged and provided plaintiff with the reasons for his decision. Tr. at 43–44; Defendants' Trial Exhibit "8" (Hearing Disposition Form). Plaintiff was sentenced to 180 days confinement in SHU, 180 days recommended loss of good time, and 180 days loss of privileges—which included loss of packages and loss of commissary. Tr. at 15–16. In addition, plaintiff testified that while in SHU he could not "communicate" with his father who was seriously ill, although he was subsequently escorted to his father's funeral by prison officials. [1] Tr. at 15–16.

Plaintiff administratively appealed as well as filed an Article 78 proceeding in state court and the hearing results were reversed based upon the fact that plaintiff was denied a requested witness, but not before plaintiff served his 180 days in SHU. Tr. at 16. Based upon these events, plaintiff commenced this lawsuit.

### III. DISCUSSION

In this § 1983 action, plaintiff asserts that his Fourteenth Amendment due process rights were violated by defendant Wilkerson because Wilkerson was not an impartial hearing officer. Plaintiff asserts that Wilkerson was not impartial because he witnessed and investigated the May 19, 1990 incident in the Clinton auditorium. The court, however, need not decide the issue of whether Wilkerson was impartial because it concludes that plaintiff was not entitled to the due process protection of the Fourteenth Amendment. Furthermore, even assuming plaintiff was entitled to due process protection, the court concludes that Wilkerson is immune from liability under the doctrine of qualified immunity.

The Fourteenth Amendment prohibits an individual from being deprived of constitutionally protected liberty interests without due process. See Hewitt v. Helms, 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Constitutionally protected liberty interests of a prison inmate are limited to freedom from restraints which impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 115 S.Ct. 2293, 2300 (1995). The Constitution "does not protect [inmates from] every change in the conditions of confinement having a substantial adverse impact on the prisoner" if those changes are "within the normal limits or range of custody which the conviction has authorized the State to impose." Id. at 478, 115 S.Ct. at 2297 (internal quotations and citations omitted). Rather, the "Due Process Clause protects against restraint or conditions of confinement that 'exceed[ ] the sentence in ... an unexpected manner.' ' Arce v. Walker,—F.3d—, 96–2012, 1998 WL 119612 (2d Cir. Mar.18, 1998). The Supreme Court has instructed that federal courts should "afford appropriate deference and flexibility to state officials trying to manage a volatile environment." Sandin, 515 U.S. at 482, 115 S.Ct. at 2299.

**\*3** After examining the specific circumstances of plaintiff's confinement during his time in SHU, the court concludes that plaintiff did not have a constitutional liberty interest which was interfered with when he was disciplinarily confined in SHU for 180 days. Other than the length of time plaintiff was confined to SHU, plaintiff has offered little evidence to demonstrate that his punishment was of such a nature as to confer a constitutionally protected liberty interest. As the case law demonstrates, it is clear that plaintiff's confinement in SHU for 180 days was not an atypical or significant hardship, especially when compared to his sentence of six to twelve years. See Sealy v. Coughlin,—F. Supp.

Spence v. Senkowski, Not Reported in F.Supp. (1998)

1998 WL 214719

—, No. 92–CV–47, 1998 WL 113383 (N.D.N.Y. Mar.13, 1998) (152 days in SHU is not an atypical or significant hardship); *Horne v. Coughlin,* 949 F.Supp. 112, 117 (180 days in SHU does not implicate due process protection); *Carter v. Carriero,* 905 F.Supp. 99, 104 (W.D.N.Y.1995) (270 days in SHU not considered an atypical or significant hardship); *Husbands v. McClellan,* No. 93–CV–6025L, 1998 WL 24232, at *2 (W.D.N.Y. Jan.13, 1998) (180 days in SHU not an atypical or significant hardship); *Ruiz v. Selsky,* No. 96 Civ.2003, 1997 WL 137448, at *6 (S.D.N.Y. March 24, 1997) (192 days in SHU not a significant and atypical hardship); *Nogueras v. Coughlin,* No. 94 Civ. 4094, 1996 WL 487951, at *5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU does not trigger due process concerns).

Moreover, plaintiff's testimony regarding his loss of privileges the conditions of his confinement is insufficient to elevate his claim to constitutional proportions. *See, e.g., Sealey,*—F. Supp at—, 1998 WL 113383 at *5 ("the denial of certain privileges enjoyed by inmates placed in general population fails to identify conditions outside the expected parameters of the sentence imposed by law." (citing *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)). Plaintiff testified, for instance, that he was deprived of packages, telephone privileges, commissary privileges, and his prison job. Furthermore, he stated that when he was transported anywhere in the facility, he was required to be placed in handcuffs and shackles. While these conditions of confinement are "more restrictive than those in general population," they are insufficient to implicate a liberty interest, even when coupled with the 180 days plaintiff was confined to SHU. *See Arce,* 1998 WL 119612 at * 3–4 (a prison inmate is required to show that his confinement created an atypical and significant hardship to establish the existence of a liberty interest); *Jones v. Kelly,* 937 F.Supp. 200, 203 (W.D.N.Y.1996) (court found that loss of privileges such as telephone was insufficient for finding that plaintiff's confinement was atypical). [2] Accordingly, the court concludes that plaintiff is not entitled to the protections of the Fourteenth Amendment and therefore his § 1983 action must fail.

**\*4** In the alternative, even if the court assumed that plaintiff's confinement to SHU represented grievous losses of liberty entitling him to due process protections—which the court declines to find—the evidence presented at trial demonstrated that defendant Wilkerson would be entitled to qualified immunity. Qualified immunity protects prison

officials from personal liability under § 1983 when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). These officials' action are to be assessed in light of the legal rules that were clearly established at the time the actions are taken. *E.g., Anderson v. Creighton,* 483 U.S. 635, 638–40, 107 S.Ct. 3034, 3037–38, 97 L.Ed.2d 523 (1987). Moreover, public officials may be afforded the protection of qualified immunity "even if the contours of the plaintiff's federal rights and the public officials' permissible actions were clearly delineated at the time of the actions complained of, if it was objectively reasonable for the officials to believe that their actions did not violate those rights." *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993).

Plaintiff asserts that his constitutional right to due process was violated because he did not have a hearing before an impartial hearing officer. In this regard, plaintiff contends that New York prison regulations prohibit persons who either witness the incident or investigate the incident from acting as hearing officers in a subsequent hearing concerning that incident. *See* N.Y.C.R.R. tit. 7, § 254.1. Plaintiff contends that inasmuch as Wilkerson was present at the scene he witnessed and investigated the incident and then acted as a hearing officer in violation of the section 254.1. The evidence, however, revealed that Wilkerson did not witness nor investigate the specific incident involving plaintiff (*i.e.,* the alleged assault on Officer Bishop). Wilkerson merely arrived at the auditorium as the facility's acting superintendent to ensure that order was restored and maintained in a potentially explosive situation. Tr. at 39–41.

On direct examination during trial, Wilkerson testified that he only stayed in the auditorium long enough to observe the inmates begin to be escorted out of the auditorium. Tr. at 40. Further, Wilkerson testified that he was not directly involved in the alleged incident involving plaintiff, that he did not witness Officer Bishop—or any other prison officer—being assaulted, that he only learned at a later time that an officer was assaulted, and that he did not review the plaintiff's misbehavior report. Tr. at 41–42; *cf. Hameed v. Mann,* 849 F.Supp. 169, 173 (N.D.N.Y.1994) (court found that hearing officer's impartiality was not compromised by pre-hearing briefing by superintendent that everyone on B–2 was involved in the incident). Wilkerson also testified that he had no

Spence v. Senkowski, Not Reported in F.Supp. (1998)

1998 WL 214719

predisposition as to whether plaintiff was guilty prior to the hearing. Tr. at 47. Significantly, Wilkerson testified that there was nothing about the fact that he was present at the scene of the incident which entered into his deliberations at the time of plaintiff's hearing and that he did not consider himself flawed as a hearing officer because he did not possess information prior to the hearing to form an opinion as to plaintiff's guilt or innocence. Tr. at 83, 85.

 **\*5** Based upon the testimony adduced at trial, the court concludes that it was objectively reasonable for Wilkerson to believe that he was not violating plaintiff's clearly established constitutional rights to an unbiased hearing officer. *See Walker v. McClellan,* 126 F.3d 127, 128–30 (2d Cir.1997) (hearing officer entitled to qualified immunity because "the hearing officer was well-justified in the belief that his ruling was consistent with [plaintiff's] constitutional rights."); *Russell v. Selsky,* 35 F.3d 55, 61 (2d Cir.1994) (in holding hearing officer entitled to qualified immunity, court set forth that "a reasonable officer would not have recognized a denial of due process in his serving as hearing officer in a case in which he had previously served as review officer."). Accordingly, the court concludes that had plaintiff been entitled to due process protection, defendant Wilkerson would be immune from liability under the doctrine of qualified immunity.

### III. CONCLUSION

For the foregoing reasons, judgment shall be entered on behalf of defendant Wilkerson and plaintiff's complaint is hereby DISMISSED.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp., 1998 WL 214719

---

Footnotes

1    During trial, plaintiff testified that he was denied telephone privileges during his confinement to SHU. Tr. at 15. Wilkerson testified that SHU inmates can send and receive regular mail and legal correspondence. Tr. at 59.

2    During the presentation of his case, plaintiff highlighted the distinction between administrative confinement in SHU and disciplinary confinement in SHU. After reviewing this evidence, the court concludes that the administrative confinement closely resembled the disciplinary confinement in SHU at Clinton. *See* Tr. at 56 (Wilkerson testified that an inmate in SHU for administrative reasons is generally treated the same as an inmate in SHU for disciplinary reasons); *see also Jones,* 937 F.Supp. at 203 ("[d]isciplinary segregation in New York mirrors, with insignificant exceptions, the conditions of administrative segregation and protective custody." (citations omitted)). Moreover, while a "comparison between administrative and disciplinary confinement was part of the Court's analysis in *Sandin,*" the significant analysis focused on a "careful examination of the actual conditions of the challenged punishment compared with ordinary prison conditions." *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997).

---

**End of Document**                                                                 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Nogueras v. Coughlin, Not Reported in F.Supp. (1996)

1996 WL 487951

KeyCite Yellow Flag - Negative Treatment
**Disagreed With by** [Justice v. Coughlin,](#) N.D.N.Y., October 15, 1996

1996 WL 487951
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

William NOGUERAS, Plaintiff,

v.

Thomas A. COUGHLIN III, Commissioner,
New York State Department of Correctional
Services, Donald Selsky, Director, Special
Housing Unit and Inmate Discipline; John Keane,
Superintendent, Sing Sing C.F.; Robert McClellan,
Superintendent, Southport C.F.; Melvin Hollins,
First Deputy Superintendent, Southport C.F.;
Charles Griener, First Deputy Superintendent,
Sing Sing C.F.; Kenneth Goewey, Lieutenant,
Sing Sing C.F.; Harry Kerrigan, Corrections
Sergeant, Sing Sing C.F.; and Robert Johnson,
Corrections Officer, Sing Sing C.F., Defendants.

No. 94 Civ. 4094 (JSM).
|
Aug. 27, 1996.

**Attorneys and Law Firms**

William Nogueras, Pine City, New York, pro se.

[Alfred A. Delicata,](#) Assistant Attorney General, New York City, for defendant.

OPINION AND ORDER

[JOHN S. MARTIN, Jr.,](#) District Judge:

**\*1** Pursuant to [42 U.S.C. § 1983,](#) plaintiff, William Nogueras, has filed a complaint against the defendants for allegedly violating his First, Eighth and Fourteenth Amendment rights. This action is before the Court on defendants' motion for summary judgment. For the reasons stated below, the motion is granted.

*BACKGROUND AND FACTS*

On July 23, 1993, while Nogueras was an inmate at Sing Sing Correctional Facility, defendant, Robert Johnson, who was a Corrections Officer, discovered that Nogueras was in possession of literature pertaining to the Almighty Latin King Nations ("the Latin Kings"). The New York State Department of Correctional Services ("the Department") has not authorized the Latin Kings to function as a group within the Department's facilities. The materials consisted of portions of the Latin Kings' constitution including blank disciplinary forms; rules and codes of conduct for members; completed disciplinary forms detailing charges against two members and the actions taken against them; a document entitled "Towards An A.L.K.N. Prison Movement" which Nogueras claimed he adapted from a chapter entitled "Toward A Red Prison Movement" from "Blood in My Eye" by George Jackson; and a history of the Latin Kings.

The literature was confiscated and reviewed by defendant, Corrections Sergeant Harry Kerrigan, who filed a misbehavior report [1] charging plaintiff with possessing contraband in violation of Rule 113.23 of the Department's Institutional Rules of Conduct [2] and with participating in acts which were detrimental to the prison in violation of Rule 104.12 [3]

A Tier III disciplinary hearing conducted by defendant, Lieutenant Kenneth Goewey, was held on July 27, 1993. The literature in question was not introduced into evidence but Goewey stated that he had reviewed the materials. The only evidence presented by Nogueras was a tobacco rapper which allegedly contained the Latin Kings' logo. Nogueras indicated that he had a box of literature in his cell but did not bring it to the hearing because it was too heavy. Nogueras was found guilty of the charges against him and sentenced to 24 months in a special housing unit ("SHU") with a loss of telephone, package and commissary privileges. Nogueras was subsequently transferred from Sing–Sing to Southport Correctional Facility ("Southport").

He then appealed the decision to defendant, John Keane, Superintendent of Sing Sing, who directed plaintiff to address his appeal to the Director of the Special Housing Unit and Inmate Discipline, defendant, Donald Selsky. After reviewing the matter, Selsky reduced Nogueras' disciplinary sentence to 365 days in SHU with a loss of privileges. Nogueras also wrote to defendant, Charles

Nogueras v. Coughlin, Not Reported in F.Supp. (1996)

1996 WL 487951

Griener, a First Deputy Superintendent at Southport, complaining that the literature had not been referred to the Facility Media Review Committee in accordance with the Department's rules. Subsequently, defendant, Robert McClellan, Southport's Superintendent, intervened and directed, defendant, First Deputy Superintendent Melvin Hollins to review Nogueras' case. Hollins found no procedural or substantive errors that would warrant a reversal.

**\*2** Before Hollins conducted this review, however, Nogueras initiated an Article 78 proceeding in New York State Supreme Court against the defendants with the exception of Hollins and McClellan. Nogueras claimed that his rights to due process and free speech had been violated and he sought to be released from SHU. On January 10, 1994, the presiding judge appointed counsel for Nogueras and issued an order to show cause against defendants which was returnable on February 24th. On January 27th, however, Selsky reversed the findings of Nogueras' disciplinary hearing on the grounds that the misbehavior report and the other evidence failed to substantiate the charges against Nogueras. He also ordered that all records pertaining to the disciplinary hearing be expunged. Accordingly, Nogueras' Article 78 proceeding was dismissed as moot without prejudice.

On February 7th, 1994, Nogueras was transferred from Southport to Wende Correctional Facility and a few weeks later he was transferred to Attica Correctional Facility. He then filed this suit alleging that defendants violated his First Amendment right of free speech, his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to due process.

### DISCUSSION

Summary judgment will be granted when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In deciding whether a genuine dispute remains as to a material fact, the Court must view the evidence before it in the light most favorable to the nonmovant, *Weg v. Macchiarola,* 995 F.2d 15, 18 (2d Cir.1993), drawing all justifiable inferences in the nonmovant's favor, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

255 (1986). Summary judgment should be granted when no reasonable trier of fact could find in favor of the nonmoving party. *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992).

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Prison regulations that limit an inmate's constitutional rights are valid if they are "reasonably related to legitimate penological interests." *Turner v. Safely,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). The Supreme Court has set forth the factors to be used in determining the reasonableness of a prison regulation:

> First there must be a valid rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.... [T]he governmental objective must be a legitimate and neutral one.... A second factor ... is whether there are alternate means of exercising the right that remain open to prison inmates.... A third consideration is the impact accommodation of the asserted constitutional right will have on the allocation of prison resources generally.... When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials. Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

**\*3** *Id.* at 89–90, 107 S.Ct. at 2262.

The Department made a determination that the teachings of the Latin Kings advocate murder, extortion, violence, work stoppages and other activities which undermine the safety of inmates and prison staff. Urban Aff. ¶¶ 6, 8, 9, 10. See also *Benjamin v. Malcolm,* 1995 WL 378529, \*1 (S.D.N.Y.1995) (recognizing Latin Kings as a violent

Nogueras v. Coughlin, Not Reported in F.Supp. (1996)

1996 WL 487951

gang). The Department also found that the Latin Kings distribute certain literature, which depicts the gang as a social organization committed to promoting cultural values, in an effort to coax unsuspecting members to join but, once they have done so, they are required to adhere to the Latin Kings' violent philosophies or face discipline meted out by other gang members. *Id.* at ¶ 13. As the Supreme Court has stressed, "[p]rison officials should be accorded wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). See also *Turner,* 482 U.S. at 84–54, 107 S.Ct. at 2259 (recognizing that federal courts should accord deference to the administrators of state penal systems). Giving deference to the Department's determination of the threat to prison security posed by the Latin Kings, the Court finds no First Amendment violation in the Department's banning Latin Kings literature and declaring it contraband.

Applying the *Turner* factors, the Department's policies requiring groups to be authorized and deeming unauthorized groups' materials contraband are reasonably related to the valid penological interests of maintaining prison security by containing gang activity and inmate violence. Nogueras retains the right to participate in and read about the philosophies of other authorized organizations that promote social and cultural awareness, such as Latinos Unidos of which he is a member. The Court must also give deference to the Department's determination that recognition of the Latin Kings would have an adverse impact on guards and other inmates by increasing the incidence of inmate violence. Finally, Nogueras' proffered alternative of requiring the Department to allow inmates access to those portions of the Latin Kings' literature which do not openly advocate violence is unacceptable given that the Department has already found that the Latin Kings use such literature to facilitate the recruitment and indoctrination of new members. Additionally, allowing prisoners access to seemingly benign Latin Kings literature overlooks the fact that members would still be able to use codes to convey those messages which the Department has deemed inappropriate. See *Turner, supra,* 482 U.S. at 93, 107 S.Ct. at 2264 (upholding ban on inmate-to-inmate correspondence and rejecting alternative of officials monitoring mail because inmates could easily resort to

use of codes to prevent detection of their real messages). Thus, the Court finds that the defendants did not violate Nogueras' First Amendment rights by confiscating his Latin Kings literature. Nor does the Court find any merit in Nogueras' contention that he was punished simply because he was a member of the Latin Kings as there was sufficient evidence to find that he was in possession of contraband.

**\*4** In addition to his First Amendment claims, Nogueras asserts several due process claims which must be analyzed in light of the Supreme Court's holding in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In *Sandin,* the Supreme Court limited the extent to which the Due Process Clause protects the liberty interests of prisoners.

In that case, the plaintiff, Demont Conner, an inmate at a Hawaiian prison, claimed that prison officials had deprived him of due process by sentencing him to 30 days of disciplinary segregation for high misconduct without allowing him to present witnesses at his disciplinary hearing. After Conner had served his thirty days, a deputy administrator found that the high misconduct charge was not supported by the evidence and expunged Conner's record. The District Court originally granted the prison officials' motion for summary judgment. The Ninth Circuit reversed and found that Conner had a liberty interest in remaining free from disciplinary segregation and that a trier of fact should resolve whether Conner received all the process that he was due as outlined in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The Supreme Court, however, reasoned that "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law." *Sandin,* 515 U.S. at ——, 115 S.Ct. at 2301. Thus, the Due Process Clause only protects a prisoner from restraint which exceeds his original sentence or which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 2300.

The Court found that Conner's confinement did not fall into either category. His sentence of thirty days in disciplinary segregation did not exceed similar, but totally discretionary confinement [such as administrative segregation or protective custody,] in either duration or degree of restriction." *Id.* at 2301. The disciplinary action did not have any effect on the duration of

Nogueras v. Coughlin, Not Reported in F.Supp. (1996)

1996 WL 487951

Conner's sentence. *Id.* at 2302. Moreover, the charges were expunged from his record. *Id.* at 2301.

In analyzing Nogueras' due process claims the Court must first determine whether Nogueras had a protected liberty interest in remaining free from disciplinary segregation. If this question is answered in the affirmative, then the Court must decide if Nogueras' received all the process that he was due. Under the reasoning of Sandin, Nogueras' due process claims must fail because his confinement in SHU did not affect the length of his original sentence nor did the duration and degree of his disciplinary sentence impose any atypical and significant hardships in relation to the ordinary incidents of prison life.

First, Nogueras has not demonstrated any facts which would indicate that the duration of his original sentence was affected by the disciplinary action taken against him. There is no evidence that any good time credits were revoked and, like the plaintiff in *Sandin,* the disciplinary charges were expunged from Nogueras' record.

 **\*5** With respect to the length of Nogueras' disciplinary confinement, 210 days in SHU does not in and of itself trigger due process concerns. See, e.g., *Polanco v. Allan,* 1996 WL 250237, *3 (N.D.N.Y.1996)* ("period of segregation of one year or less affords no protected liberty interest"); *Carter v. Carriero,* 905 F.Supp. 99, 103 (W.D.N.Y.1995); (270 days in SHU did not entitle inmate to invoke *Wolff* standards); *Delaney v. Selsky,* 899 F.Supp. 923, 927 (N.D.N.Y.1995) (197 days); *McMiller v. Wolf,* 1995 WL 529620 (183 days); *Tulloch v. Coughlin,* 1995 WL 780970, *2 (W.D.N.Y.1995)* (180 days).

Nor has Nogueras shown that the conditions of his confinement forced him to suffer any atypical hardships in relation to the ordinary incidents of prison life. In New York, inmates can be placed in SHU for disciplinary confinement, detention, administrative segregation, protective custody, or for any other reason, with the approval of the deputy commissioner for facility operations. 7 N.Y.C.R.R. §§ 301.1—301.7. Restrictions on telephone use, recreational activities, access to law libraries, visitation, personal property, educational and employment opportunities generally apply to all inmates confined to SHU regardless of the reason that they have been placed there. See *Rosario v. Selsky,* 1995 WL 764178, *5 (S.D.N.Y.1995); *Carter,* 905 F.Supp. at 103.* Thus, because Nogueras has not shown that any particular conditions of his confinement were substantially dissimilar to those faced by inmates placed in administrative segregation or protective custody, the Court finds that his confinement did not impose any atypical hardships. Cf. *Delaney v. Selsky,* 899 F.Supp. 923 (N.D.N.Y.1995) (197 days in SHU could be atypical and significant where inmate, who was almost seven feet tall and was forced to either sit, stand or lay in uncomfortable positions for twenty-three hours each day, suffered back injuries). Accordingly, Nogueras' due process claims must fail.

Finally, Norgueras has not demonstrated any facts which would support his claim that the defendants violated the Eighth Amendment.

## CONCLUSION

For the foregoing reasons, defendants are entitled to summary judgment on all of Nogueras' claims.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1996 WL 487951

Footnotes

1    The misbehavior report described the incident as follows:
        After reviewing the written material from inmate Nogueras' cell at the above time, date and location, I found the material to be of a content dealing with the philosophies and actions of the Almighty Latin King Nation (ALKN), a group not sanctioned by the Department. The literature promoted an unauthorized organization, which is not in accord with the safety and security or good order of the facility. The literature was forwarded to the D.S.S. Office.

2    Rule 113.23 provides that "[i]nmates shall not be in possession of any contraband.... [C]ontraband is any article that is not authorized by the superintendent or his designee." 7 N.Y.Codes R. & Regs, § 270.2(B), Rule 113.23. Violation of this Rule may be classified as a Tier III infraction. *Id.*

**Nogueras v. Coughlin, Not Reported in F.Supp. (1996)**

1996 WL 487951

3    Rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility" and may be classified as a Tier III infraction. 7 N.Y.Codes R. & Regs, § 270.2(B), Rule 104.12.

---

                                  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

---